**274 A.2d 742.**

STATE *vs.* ALEXANDER MANCINI.

MARCH 10, 1971.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

JOSLIN, J. Alexander Mancini was tried and convicted by a jury in the Superior Court on an indictment which charged that on February 18, 1968, by verbal communication he maliciously threatened injury to the property of

Harold Anderson and Michael Muksian with intent to extort money in violation of the laws of this state.[1]

The case is here on Mancini's bill of exceptions. The testimony adduced at the trial discloses that in November 1967 the El Rio, a nightclub located in Providence, began to be plagued by disturbances. Persons were assaulted, fights occurred, tables were tipped over, and chairs were thrown. When the disturbances continued with increasing frequency and business began to fall off, the owners complained to the police. While there was no testimonial evidence that Mancini actively participated in any of the disorders, there is evidence that he knew some of the people involved.

The disturbances culminated on February 18, 1968, with an assault on Ernest Grasso who had been employed at the club as a part-time bartender for almost 17 years. That afternoon Grasso was serving customers at one end of the bar when defendant, ostensibly annoyed because he was not promptly served, threw an ashtray in his direction. The two exchanged words, and then defendant jumped over the bar. In the altercation which followed Grasso's nose was cut, his eyeglasses knocked off, his eye blackened, his shirt ripped, and his wristwatch broken. At one point during the scuffle Mancini broke a bottle of Guggenheimer whiskey on the floor and then, broken bottle in hand, warned Grasso that he would "get" him if he called the

---

[1]The offense of extortion is defined in G. L. 1956, §11-42-2 as follows: "Whoever, verbally or by a written or printed communication, maliciously threatens to accuse another of a crime or offense, or by a verbal or written or printed communication maliciously threatens any injury to the person or property of another, with intent thereby to extort money or any pecuniary advantage, or with intent to compel any person to do any act against his will, shall be punished by imprisonment in the adult correctional institutions for not more than fifteen (15) years, or by a fine of not more than five thousand dollars ($5,000), or both."

police. Notwithstanding, the police were called and Mancini was arrested and taken to the police station. Shortly thereafter Grasso left the club and went to his own home to clean up and to change his clothes. While there he received a telephone call from Muksian, one of the two owners of the club, as a result of which he accompanied Muksian to the police station. On arrival he told a police captain that he was "dropping the charges" and wanted "Mancini released." The police complied. Mancini was released and returned to the club with Grasso and Muksian. The next day Grasso voluntarily, and without explanation, terminated his employment.

The sequel to the Grasso incident occurred at the club that night when Anderson, the other owner of the club, was approached by Mancini and asked whether he had talked to his partner. He answered "No." Then Mancini said "Well, for $100 a week you can stop all these fights." When Anderson replied "I am not going to" and started to walk away, Mancini said "Wait a minute, you're getting excited. If you have any trouble you can come to see Alex." Anderson responded that he "wasn't going to pay anybody a quarter" whereupon Mancini "grabbed" him by the shirt. At that point police detectives, who were on the premises, intervened and arrested Mancini. Since his arrest there have been no disturbances at the El Rio.

Mancini's bill of exceptions contains more than fifty separate exceptions. They have been briefed and argued under ten separate issues. The first issue concerns testimony[2] that disturbances occurred at the club between

---

[2]A fair sampling of the kind of testimony he finds objectionable and to which he took exception is:

"Q And did you observe anything in the vicinity of the club?

"A Yes. I was operating my patrol car southerly down Broad Street and I seen a group of youths, about seven or eight young men, drag a man out into the middle of Broad Street and leave him there.

November 1967 and February 18, 1968. Mancini considers that testimony as though it were an accusation that he was responsible for those disturbances, and as if it were evidence that he were guilty of having committed crimes independent of and unconnected with the offense of extortion on which he was being tried. Evidence of that kind, he claims, was prejudicially immaterial because it furnished the foundation for an inference that a person who would provoke those kinds of disorders would be likely to commit the offense charged, and he argues that such evidence should not have been allowed to aid in his conviction.

That argument misconceives the purpose for which the evidence of the prior disturbance was proffered. Under our form of statute proof of a threat by means of which money or something of value is to be obtained is the essential element of the offense of extortion. *State* v. *McInnes,* (Fla.) 153 So.2d 854; *Commonwealth* v. *Snow,* 269 Mass. 598, 602, 169 N.E. 542, 543; 3 Wharton, *Criminal Law & Procedure,* §1398 at 796. In determining whether a threat of this kind was made the concern is not so much with the particular words used as it is with whether their natural purport and effect considered contextually was to convey a threat. *People* v. *Thompson,* 97 N. Y. 313, 318. And in resolving that issue it is proper to receive, but with caution, evidence

---

"Mr. Bevilacqua: Your Honor, I'm going to object and move all that testimony be stricken from the record, and, your Honor, may I make the same motion as before on the question of passing and also that my exception may be noted.

"The Court: All right. Let's take a recess at this point. I want to discuss matters with counsel.

(Defendant's exception noted)

"The Court: Motion denied, exception noted on the record.

"Q Where were these people dragging the man from?

"A From the parking lot—

"Mr. Bevilacqua: I object.

"The Court: Allowed; exception.

(Defendant's exception noted)

"A From the parking lot of the El Rio cafe."

of any circumstance even if criminal in nature provided it is connected with the offense charged in such a way that it tends to establish an intent, motive, plan, design or scheme. See *State* v. *Colangelo,* 55 R. I. 170, 173-74, 179 A. 147, 149.

When we apply these considerations to the record in this case, we are forced to conclude that the prior disturbances were significant circumstances which were appropriate to explain and to give meaning and relevance to Mancini's alleged statements that "Well, for $100 a week you can stop all these fights" and that in the event of trouble "you can come see Alex." They were available as evidence to assist in ascertaining whether the purport and natural effect of those words conveyed to Anderson that a weekly tribute of $100 would bring an end to the disturbances. In deciding whether that was the meaning of the language, the relations of the parties, as well as the circumstances under which Mancini spoke the words, were relevant to the establishment of a material fact in the chain of proof of the crime in issue. Whether he had the power to curb the disorders was in itself unimportant. What was critical was whether he in effect told Anderson "Unless you pay me $100 a week the disturbances will continue." To allow the testimony was not error. *People* v. *Dioguardi,* 8 N.Y. 2d 260, 168 N.E.2d 683.

Mancini next claims that the trial justice erred in permitting leading questions. The questions objected to, however, were not leading because they neither suggested the specific tenor of the desired replies nor contemplated responses that would be given irrespective of an actual memory; or, even if leading, because so framed as to invite a "yes" or "no" answer, were not improper because the desired answers in the desired form were not on points material to a disposition of the case, and, in any event,

could not reasonably be said to have influenced the verdict.[3] *Urbani* v. *Razza*, 103 R. I. 445, 238 A.2d 383.

The defendant also argues that objectionable hearsay testimony was allowed. An example of the kind of evidence he challenges is found in the testimony of the police officer who said that he went to the accident room of the Rhode Island Hospital at 1:45 on the morning of January 6, 1968 to investigate a complaint of a "visibly shaken" and "very excited" person who told him that he had been assaulted about three quarters of an hour earlier in front of the El Rio.[4]

---

[3]Examples of the two kinds of questions objected to and responses are:

"Q What did he respond when you asked him why he threw the ashtray?

"Mr. Bevilacqua: Your Honor, I'm going to object; questions are leading.

"Mr. Israel: What did he respond?

"The Court: The court is going to allow it. Exception may be noted.

(Defendant's exception noted)

"A Well, he said when he come in there he had to be served, and I told him there was other customers ahead of him, and as I turned around to punch my sale, he come over the bar at me, and that was all that was done.

\* \* \*

"Q Now, at your bar at that time, did you sell Guggenheimer's whiskey?

"A Yes, we did.

"Mr. Bevilacqua: Your Honor, I'm going to object. What's the materiality?

"The Court: No commercials for any of the parties. Is this material?

"Mr. Israel: Yes.

"The Court: All right. Guggenheimer's."

[4]The investigating officer's testimony of what was said at that interview includes the following:

"Q And what was the nature of the complaint that he gave to you at the Rhode Island Hospital?

"A He said he was assaulted in front of the El Rio Cafe.

"Mr. Bevilacqua: I'm going to, once again, move to strike.

■ Clearly the officer's characterization of the declarant's apparent emotional state was admissible under the principle which permits a lay witness to give his opinion on such matters as the appearance and physical condition of another person if that opinion is based upon observations of composite facts which he could not otherwise convey to a jury. The underlying rationale is that there is no better way to portray another's emotional state than to characterize him as "visibly shaken" and "very excited." Those characterizations could be testified to in this case as observable conditions. *Fillman* v. *State*, 41 Ala. App. 175, 177-78, 127 So.2d 628, 629-30; *People* v. *Deacon*, 117 Cal. App.2d 206, 210, 255 P.2d 98, 101; *Commonwealth* v. *Bonomi*, 335 Mass. 327, 339, 140 N.E.2d 140, 151; 7 Wigmore *Evidence*, §1974 at 113 et seq. (3d ed.)

■ It is just as clear that the trial justice did not abuse his discretion when he ruled that testimony by the officer of the victim's extrajudicial utterances qualified for admission under the spontaneous exclamation exception to the hearsay rule. Under that exception out-of-court statements are admissible, even if not strictly contemporaneous with the exciting cause, if from a consideration of all of the facts

---

"The Court: The court will deny the motion; exception noted on the record.

(Defendant's exception noted)

"Q And did he tell you why he had been struck?

"A Yes, he did.

"Mr. Bevilacqua: I object for the same reason.

"The Court: Allowed; exception.

(Defendant's exception noted)

"Q What did he say?

"A He said he was involved in an argument with two men in the El Rio Cafe about 1:00 A.M.

"Mr. Israel: You may inquire.

"Mr. Bevilacqua: Your Honor, I'm going to object and move that be stricken from the record.

"The Court: Motion denied, exception noted.

(Defendant's exception noted)"

in the case it appears that the declarant when he spoke was still laboring under the stress of the nervous excitement engendered by the event he describes. *State* v. *Nordstrom,* 104 R. I. 471, 476, 244 A.2d 837, 840. Given the circumstances described by the officer in this case, the trial justice was warranted in assuming that the victim's utterances were "* * * made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection * * *." 6 Wigmore *Evidence,* §1747 at 135. Such utterances, Wigmore continues,

> "* * * may be taken as particularly trustworthy (or, at least, as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker's belief as to the facts just observed by him; and may therefore be received as testimony to those facts."

The defendant also argues that the trial justice abused his discretion in limiting the scope of his cross-examination of Harold Anderson. Certainly it was not error to foreclose so much of that cross-examination as was not directed either to the witness' credibility or to any valid matter that had been raised on direct examination, and all but one of the inquiries which Mancini includes in this issue fit into this classification.[5] *Atlantic Refining Co.* v. *Director of Public Works,* 102 R. I. 696, 233 A.2d 423; *State* v. *Campbell,* 95 R. I. 370, 187 A.2d 543. In the remaining inquiry Anderson was asked whether Mancini had threatened him with injury

---

[5]An example of this kind of inquiry was:
"Q Do you know when this charge was placed against Mr. Mancini?
"Mr. Israel: Objection.
"The Court: The record speaks for itself. That's a matter over which he'd have no control. Sustained. Exception."

or had said that he was going to injure anybody.[6] That question, although directly related to the ultimate issue in the case, had in substance been asked and answered earlier in the cross-examination, and, in any event, was objectional in the form in which it was couched. The defendant, however, instead of rephrasing the question, elected to rest on his exception to the ruling sustaining the state's objection. In the light of these circumstances, he should not now be allowed to claim that he was prejudiced.

The next issue defendant raises is whether the exclusion of two spectators from the courtroom improperly curtailed his constitutional right to a public trial. The state looks to *State* v. *Raposa*, 100 R. I. 516, 217 A.2d 469 and *State* v. *Cyrulik*, 100 R. I. 282, 214 A.2d 382, as justifying the exclusion order. Those cases recognize the inherent right of a court to sequester witnesses during the taking of testimony; they do not decide whether the exclusion of a particular segment, albeit a small one, of the general public violates a criminal defendant's right to a public trial. That right, although rooted in the reaction to the abuses of the secret proceedings of the English Star Chamber, is not usually viewed as imposing "a rigid, inflexible straitjacket" upon a trial justice's conduct of a trial. Rather has it generally been recognized as being subject to a court's inherent

---

[6]The colloquy between counsel and court with respect to this question was:

"Q Now, did he say that he was going to injure anybody: did he threaten you or threaten you with injury?
"Mr. Israel: I object to that in that form.
"Mr. Bevilacqua: Your Honor, that's the gist—
"The Court: It's a conclusion. If you ask the question, 'Did he say anything else,' and so on. All right.
"Mr. Bevilacqua: Your Honor, this is—
"The Court: He didn't threaten; you've already asked him questions in that vein, but these call for conclusions in this form.
"Mr. Bevilacqua: Exception.
(Defendant's exception noted)"

power to regulate admission to the courtroom and to restrict attendance at the trial as conditions and circumstances may reasonably demand in order to preserve order and decorum, or to protect the rights of the parties and the witnesses, or generally to further the administration of justice. *People* v. *Jelke,* 308 N. Y. 56, 123 N.E.2d 769, 772. See also *United States* v. *Fay,* 350 F.2d 967 (2d Cir. 1965) ; *State* v. *Lawrence,* (Iowa), 167 N.W.2d 912; Annot., 48 A.L.R.2d 1436.

In our case, immediately following Grasso's appearance on the witness stand, the assistant attorney general prosecuting the case represented to the trial justice that the same events leading to the Mancini indictment resulted in extortion indictments against two other individuals, that they were attending the trial, that their presence in the courtroom had terrorized Grasso, and that their continued presence would have an intimidating effect on other witnesses. For those reasons he moved that all persons, except accredited members of the press, be barred from attendance at court sessions during the taking of testimony. The trial justice rejected that request. He noted, however, that early in the proceedings he had observed these two individuals conversing with Mancini during a recess. He was concerned, he said, that the jurors might overhear them talking to each other or to Mancini about the case, and he excluded them from the courtroom, as well as from the courthouse and adjacent areas, in order to minimize that possibility. The courtroom doors, however, remained open to the general public. In our judgment he acted to insure proper objectives and within permissible limits of his inherent right to regulate the conduct of the trial.

As a corollary to the argument of wrongful exclusion, Mancini also contends that the trial justice denied him a fair trial by refusing to exclude from the courtroom the police officer who had been in charge of the investigation

of the disturbances at the El Rio and whose assistance was undoubtedly needed by the state in the prosecution of the indictment. That in so ruling the trial justice did not abuse his discretion cannot seriously be questioned. *State* v. *Raposa, supra.*

The next issue requiring consideration relates to the prosecutor's closing argument to the jury. The defendant interrupted that argument eleven times with objections, and there was little that the prosecutor said which defendant found agreeable. He now argues that the remarks objected to were either inflammatory and "prejudicial per se," or were "irrelevant and incompetent and not supported by either the evidence or the law." At the trial, however, he did not request cautionary instructions. Ordinarily that failure would now preclude him from complaining that the remarks were improper. *State* v. *Hathaway,* 52 R. I. 492, 501, 161 A. 366, 369; *State* v. *Riddell,* 38 R. I. 506, 511, 96 A. 531, 533; *State* v. *Farr,* 29 R. I. 72, 79, 69 A. 5, 8; *State* v. *Hull,* 18 R. I. 207, 212, 26 A. 191, 192. There are, of course, exceptions. One would be in those instances where the trial justice found the challenged remarks to be proper, since as to them it obviously would have been an idle gesture for defendant to request a cautionary instruction. *State* v. *Werner,* 87 R. I. 314, 318, 140 A.2d 502, 504; another would be if the prosecutor had exceeded propriety in so flagrant a manner that even a precautionary instruction would not have sufficed to insure defendant a fair and impartial trial. *State* v. *Kozukonis,* 100 R. I. 298, 303, 214 A.2d 893, 897. Whether the arguments objected to fall within the rule or the exceptions depend upon all of the facts in the case, and while there is no formula in law which precisely delineates the proper bounds of a prosecutor's argument, *State* v. *Peters,* 82 R. I. 292, 296, 107 A.2d 428, 430, prejudice obviously inheres if the remarks are totally extraneous to the issues in the case and tend to inflame

and arouse the passions of the jury. *State* v. *Werner, supra,* at 318, 140 A.2d at 504.

Without at this point setting out in their entirety those portions of the argument which were challenged, it can fairly be said that they do not fall within the *Werner* pitfalls.[7] This becomes abundantly apparent when the argument is looked at contextually and in its entirety, as well as in the light of the several cautionary instructions which the trial justice gave to the jury on his own motion.

The defendant also claims that it was error to deny his motion for a directed verdict. He supports that position with a twofold argument. First he argues that satisfaction of the statutory requirement that he acted "maliciously" required proof that what he did was "* * * 'done in the licentious spirit, perversely, recklessly, without regard to property or the rights of others; careless of consequences

---

[7] Illustrative of the kind of argument Mancini found objectionable and of the exchange which took place between counsel and the trial justice when objection was interposed is the following:

"Now, a strange thing happened on the night of February 18th, a kind of climax. The defendant, Alexander Mancini comes into the Club El Rio, there is no substantial dispute about these facts, and commits a particularly vicious assault on the bartender, something which the regular bartender, in his four years of full-time activity had never heard of, and something for which this man on part-time came in for seventeen years, for a few extra dollars, on a quiet Sunday afternoon's activity, never happened to him before. Alexander Mancini came over the bar, smashed a whiskey bottle, throwing this man to the floor, hit the whiskey bottle against the floor and threatening to take the bartender's life—

"Mr. Bevilacqua: I'm going to object to that statement.

"The Court: The jury heard the evidence, and I might say the comments on the evidence by either of the attorneys in their arguments to you, you must bear in mind that it is your recollection of the evidence and of the testimony that counts. I am sure neither attorney wants to mislead you, but as has been indicated by Mr. Bevilacqua and Mr. Israel will do so also, and I will, namely, that if there is any question in your minds about what the evidence is, it can always be read to you, so that it is your recollection of the facts that is controlling. All right." .

and yet without settled malice.'" He borrows that definition from the meaning given to the word "wantonly" in *State* v. *Gilligan,* 23 R. I. 400, 408, 50 A. 844, 847. The same case, however, at the same page defines "malice" as "'The doing a wrongful act intentionally without just cause or excuse * * *.'" We have also said that in the criminal law "malice" means "'state of mind manifested by an intent to commit an unlawful act against another.'" *State* v. *McVay,* 47 R. I. 292, 296, 132 A. 436, 438. Within the accepted definitions there was evidence which, if looked at in the light most favorable to the state, was sufficient to require a submission to the jury on the issue whether defendant acted "maliciously."

The second argument he advances to support his position that the verdict should have been directed is that "* * * the gravamen of the offense is the successful persuasion and the installation of a new fear," that "Neither of these elements are in evidence" and that "Anderson, at no time testified that he was persuaded by Mancini and even proclaimed his lack of fear." We fault that argument also. Irrespective of how the crime of extortion may be defined in other states, the only requirement for establishment of the crime under our statute is that the specified threat be made with intent to extort. *State* v. *McInness, Commonwealth* v. *Snow, Wharton.* All *supra.*

Finally defendant, in pressing exceptions taken to the trial justice's instructions to the jury, urges the same grounds as he does with respect to other issues and those grounds we have already found to be lacking merit. Those exceptions are, therefore, overruled. Also overruled are all of his other exceptions not herein specifically considered:— some because he neither briefed nor argued them; others because neither in his brief nor in his argument did he advise us of the basis of his claim of error; and still others

because they are so lacking in merit as to require no discussion.

All of the defendant's exceptions are overruled and the case is remitted to the Superior Court.

Motion for reargument denied.

*Herbert F. DeSimone,* Attorney General, *Donald P. Ryan,* Ass't. Attorney General, for plaintiff.

*Bevilacqua and Cicilline,* for defendant.