# STATE

### v.

### Craig C. PRICE.

### No. 95–471–C.A.

Supreme Court of Rhode Island.

Feb. 10, 1998.

Robert B. Mann, Providence, for Plaintiff.

Andrea J. Mendes, Aaron L. Weisman, Providence, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

GOLDBERG, Justice.

This case comes before us on the appeal of Craig C. Price (defendant) from his judgments of conviction following a jury trial in Providence Superior Court on charges of simple assault and extortion. The defendant contends that the trial justice erred in numerous respects and that as a consequence his convictions, specifically his conviction on the charge of extortion, should be reversed. For the reasons stated below, we hold that the trial justice committed no reversible error and affirm the judgments of conviction. The facts of this case are as follows. Additional facts will be supplied insofar as they are pertinent to each issue raised on appeal.

At the time of the incident giving rise to this indictment, Mark Petrella (Petrella) was employed as a juvenile program worker (JPW) at the Rhode Island Training School. Testimony elicited at trial indicated that on the evening of October 1, 1993, Petrella and another JPW, Darrin Lucas (Lucas), were assigned to supervise residents at the school's program building, which serves as a recreational facility for the school's residents during the evening hours. The defendant, an inmate at the Training School Youth Correctional Center (YCC) at this time, was one of the residents present at the program building that evening. At approximately 9:00 p.m., Petrella escorted defendant and anoth-

er resident back to the YCC where normal procedure requires that a member of the YCC staff conduct a strip-search of the resident. Petrella was informed, however, that the YCC was short staffed that evening and that as a result he would have to conduct the strip-search of the two youths himself. During the search of defendant, Petrella discovered and confiscated four cigarettes and a lighter that defendant had obtained at the program building and secreted on his person. Petrella claimed that defendant appeared nervous and asked if he would be disciplined. Petrella further testified that he told defendant that he was required to report the incident stating, "You did what you have to do and now I have to do what I have to do."

The defendant then dressed and entered the dayroom. Petrella proceeded to the control room to compose a discipline report and an unusual-incident report regarding his discovery of the contraband on defendant. Pursuant to Training School policy, copies of the incident report are forwarded to the shift coordinator and the building manager, and a copy of the discipline report is presented to the resident. Petrella testified that upon completing the reports, he entered the dayroom where two other JPWs, Antwyon Carter (Carter) and Robert Paci (Paci), had been assigned and showed Carter the discipline report. Carter then called to defendant, who came forward and received the report. Petrella testified that upon reading the report, defendant became extremely agitated and began ranting and raving, swearing at Petrella, and stating: "I'm going to have you snuffed out. If you ever come up here, you'll be mine. You'd better take some advice from me, don't ever come up and work here."

During the course of defendant's outburst, Carter stood between defendant and Petrella, restraining defendant and trying to calm him down. Two other JPWs, Lucas and Stephen Shears, also observed the incident. These witnesses disagreed concerning whether defendant actually threatened to "snuff out" Petrella, but most did concur that defendant was extremely agitated and annoyed. In an attempt to diffuse the situation, Carter and Paci suggested that Petrella leave the scene. Petrella complied and returned to the control room where he composed additional discipline and unusual-incident reports regarding defendant's outburst. Thereafter Petrella discussed the incident with his shift coordinator and another superior at the Training School. Petrella never attempted to contact the police.

A disciplinary board at the Training School met the next day to discuss the incidents of the previous evening involving defendant. Disciplinary boards are composed of a cottage manager, who serves as chairman, a staff member, and a resident, and are generally convened to handle internal disciplinary matters stemming from infractions of Training School rules or regulations. Brian Terry (Terry), a cottage manager for the Training School and the chairman of defendant's disciplinary board, testified that if a resident is charged with more than one infraction arising from the same incident or incidents occurring in a short period of time, only the charge carrying the stiffer penalty will be considered for purposes of discipline. In this instance, the first charge, "possession of contraband," carried a penalty of a five-day lockup whereas the second charge, "words, threats or gestures intended to provoke the staff," carried a penalty of a two-day lockup. Accordingly defendant was charged only with "possession of contraband."

Terry stated that at the hearing defendant admitted to the offense, offered an explanation, and testified as follows: defendant had acquired the cigarettes and lighter at the program building; Petrella knew about the contraband because he had approached defendant at the program building, asked him what was going on, and stated that he did not care what defendant brought back to the YCC as long as it was not drugs; defendant admitted to Petrella that he had the contraband; Petrella became concerned upon learning that he himself would have to perform the strip-search of defendant and told him that he would have to take the cigarettes and write a disciplinary report because Petrella was still on probationary status; defendant became angry when given the report and said some things to Petrella that he "shouldn't have said." After weighing defendant's admission, reports of his recent good

behavior, and the maximum penalty for the infraction, the board chairman imposed a penalty of a two-day lockup.

On October 21, 1993, a Family Court trial justice conducted a review of defendant's case on ancillary matters. At that time a representative from the Attorney General's office advised the court of its concerns regarding the incident with Petrella. The trial justice requested that the State Police investigate the matter. He also ordered the Training School to notify the Attorney General's office and the Public Defender's office of any activity that might be of a criminal nature so that an investigation could be conducted to determine if any crimes had been committed.

On October 22, 1993, the State Police contacted Petrella and later met with him at the Training School; they would meet with Petrella on three to six more occasions. The State Police also interviewed other Training School staff members regarding the October 1, 1993 incident. This information was then submitted to members of the Attorney General's office who in turn presented it to the Grand Jury. On June 8, 1994, the Grand Jury returned an indictment charging defendant with one count of simple assault and one count of extortion.

A jury trial was scheduled for October 3, 1994, in Providence County Superior Court. Immediately prior to trial defendant moved to dismiss the indictment, alleging selective prosecution by the Attorney General. The trial justice conducted an evidentiary hearing on the motion in which defendant presented the testimony of a Training School cottage manager who stated that he could not recall any other resident who had previously been indicted or informed against for making threats to a Training School staff member. The defendant attempted to call the Attorney General himself to testify, anticipating that he would acknowledge that he was prosecuting defendant simply because he was dissatisfied with the sentence defendant had received for his prior offenses. The trial justice refused to require the Attorney General to testify. The defendant offered no further evidence in support of his motion, nor did the state offer any additional evidence in response. The trial justice then denied the motion to dismiss, and the trial commenced. At the close of the state's evidence, defendant moved for judgments of acquittal, arguing that the state had failed to present sufficient evidence to establish beyond a reasonable doubt the elements of either offense. The trial justice denied these motions as well.

The defendant then presented his case and eventually took the stand in his own defense. He acknowledged that he had been at the program building on the evening of October 1, 1993, and admitted that he had obtained the cigarettes and lighter, intending to bring them back to the YCC. The defendant stated that he was not worried about getting caught because Petrella had a reputation for letting the residents smoke. The defendant further testified that upon learning he would be responsible for the strip-search, Petrella told defendant that he would have to confiscate the cigarettes from him because the YCC had strict rules on contraband and if defendant were later caught with the cigarettes, it would jeopardize Petrella's future during his probationary status. The defendant maintained, however, that Petrella agreed not to write a disciplinary report on the matter. The defendant testified that he was upset when Petrella later presented him with the discipline report and admitted yelling at Petrella but claimed the intent was to expose Petrella as a hypocrite. The defendant denied that he ever threatened to kill or "snuff out" Petrella.

On October 7, 1994, the jury returned a verdict of guilty on both counts. The defendant filed a motion for a new trial that was summarily denied. The defendant appeals from his conviction on the charge of extortion.

## I

### Extortion

On appeal, defendant asserts several points of error related to the trial justice's refusal to recognize an objective victim standard as it relates to the charge of extortion. Specifically, defendant argues that the trial justice erred in (1) refusing to employ a

*reasonable person* standard in his instructions to the jury, (2) refusing to let Training School employees testify about whether the *reasonable staff member* would be afraid to return to work following the alleged threat, and (3) denying the motion for judgment of acquittal on the extortion charge because defendant's words would not have created a well-founded fear or apprehension of immediate injury on the part of a *reasonable person.* The defendant argues that the application of an objective standard is necessary because extortion involves "not the subjective response of a putative victim, but what is reasonable." In support of his argument, defendant analogizes the instant case to *State v. Jeremiah,* 546 A.2d 183 (R.I.1988), in which this court employed an objective standard in considering an assault with a dangerous weapon charge. The defendant urges this court to apply the same standard to the crime of extortion. The state maintains, however, that the way in which a threat would have an impact on a "reasonable person" is not an element of the crime of extortion and that the trial justice was correct in refusing to recognize one. As all three arguments necessarily succeed or fail on the issue of whether the crime of extortion contains an element of "reasonable" fear, we begin our analysis by reviewing the crime of extortion.

General Laws 1956 § 11–42–2, "Extortion and blackmail," provides:

> "*Whoever,* verbally or by a written or printed communication, maliciously threatens to accuse another of a crime or offense or *by a verbal or written communication maliciously threatens any injury to the person,* reputation, property, or financial condition of another, or threatens to engage in other criminal conduct with intent thereby to extort money or any unlawful pecuniary advantage, or *with intent to compel any person to do any act against his or her will, or to prohibit any person from carrying out a duty imposed by law* shall be punished by imprisonment in the adult correctional institutions for not more than fifteen (15) years, or by a fine of not more than twenty-five thousand dollars ($25,000), or both." (Emphases added.)

In interpreting this statute, this court has consistently stated that the crime of extortion consists of two basic elements: (1) an oral or a written threat to harm a person or property, (2) accompanied by the intent to compel someone to do something against his or her will. *See State v. Pule,* 453 A.2d 1095, 1097–98 (R.I.1982); *State v. Sabitoni,* 434 A.2d 1339, 1342 (R.I.1981); *State v. Pope,* 414 A.2d 781, 788 (R.I.1980); *State v. Davis,* 120 R.I. 82, 86, 384 A.2d 1061, 1064 (1978); *State v. Mancini,* 108 R.I. 261, 266, 274 A.2d 742, 745 (1971). Absent from this extensive discourse on the crime of extortion, however, are any indicia that would support the construction of § 11–42–2 urged upon us by defendant as requiring proof of an element of reasonable fear upon the part of the victim. On the contrary, we are of the opinion that the relevant statutory and case law militates against defendant's proposed interpretation.

In *Mancini* this court previously considered and ultimately rejected an argument similar to that advanced by this defendant. The defendant in *Mancini* appealed his conviction on charges of extortion, arguing that a directed verdict should have been granted because the state had failed to prove that the victim was fearful of or persuaded by him. We stated that "[i]rrespective of how the crime of extortion may be defined in other states, the only requirement for establishment of the crime under our statute is that the specified threat be made with intent to extort." *Mancini,* 108 R.I. at 275, 274 A.2d at 749. Accordingly, in applying § 11–42–2, we are of the opinion that the focus should be on a defendant and his or her subjective intent as demonstrated by his or her conduct and by the words he or she used; how the incident would be perceived by a reasonable person is not a relevant factor to the crime of extortion. We do not recognize a reasonable person standard as an element to the crime of extortion, nor are we prepared to imply one.

Turning then to defendant's specific points of appeal, we hold that the trial justice did not err in refusing to give defendant's requested jury instruction that applied a reasonable person standard or in refusing to let Training School employees testify about

whether the reasonable staff member would be afraid to return to work following the alleged threat. There is no objective person standard implicit in the statute, and thus the requested instruction and proffered testimony would have been inappropriate.

Similarly, we are unable to discern any error in the trial justice's decision to deny defendant's motion for judgment of acquittal on the charge of extortion. In so doing, we note that on appeal defendant does not challenge the sufficiency of the evidence as it relates to either element of the crime of extortion. Rather defendant argues only that were an objective person standard applied to this evidence, a judgment of acquittal would be mandated. As we do not recognize a reasonable person component to the crime of extortion, we must also reject this point of appeal.

## II

### Jury Instructions

Next defendant maintains that the trial justice erred in his instructions to the jury. Specifically, defendant asserts that the trial justice erred in refusing his request that the jury be instructed as follows:

"[T]hreatening words have to be considered in the context in which they were uttered, *State v. Mancini,* 108 R.I. 261, 274 A.2d 742, 1971, cited in *State v. Berberian,* 469 [sic] A.2d 928, 930, a 1983 case.

\*   \*   \*

A threat to kill without more does not constitute a criminal offense. *State v. Pule,* 453 A.2d 1095, 1097 (R.I.1982).

Thus if you find the defendant made a threat to kill, but did not accompany the threat to kill with the intent to compel Mark Petrella to do an act against his will or to prohibit Mark Petrella from carrying out a duty imposed by law, you must find the defendant not guilty of extortion."

■   An examination of a party's challenge to specific jury instructions must begin with a review of the charge to the jury in order to determine its sufficiency and correctness. *See State v. LaRoche,* 683 A.2d 989, 997 (R.I.1996); *State v. Gordon,* 508 A.2d 1339, 1349 (R.I.1986). "We will not examine single sentences. Rather, the challenged portions must be examined in the context in which they were rendered." *La-Roche,* 683 A.2d at 997 (quoting *Gordon,* 508 A.2d at 1349). Furthermore, this court has often stated its approval of the trial justice's common practice of using his or her own words to summarize the elements of the offense and the applicable case law. *See State v. Durfee,* 666 A.2d 407, 409 (R.I.1995). "[A] trial justice's refusal to grant a request for jury instruction is not reversible error if the requested charge is fairly covered in the general charge." *Taylor v. Allis Chalmers Corp.,* 610 A.2d 108, 109 (R.I.1992). *See also State v. Lane,* 609 A.2d 633, 636 (R.I.1992); *State v. Jette,* 569 A.2d 438, 442 (R.I.1990).

■   After reviewing the instructions as given, we hold that defendant's argument is wholly without merit and is simply not supported by the record. With respect to the first request, the trial justice did instruct the jury, albeit in his own words, on this precise issue, stating, "You may take into account all of the circumstances then existing at the time the threat was made." Similarly, defendant's second request was adequately covered in that the trial justice clearly stated that the state had to prove the existence of a threat *as well as* the "specific intent of the defendant in making the threat." Therefore, we hold that the instructions were both sufficient and correct and that defendant's appeal on this issue must fail.

## III

### *Batson* Objection

The defendant next argues that the trial justice improperly allowed the state to exercise a peremptory challenge to excuse the only remaining black juror available for service. In the jury questionnaire and during voir dire, juror No. 212 admitted that he had been convicted of an offense in 1983. Upon further investigation the state learned that juror No. 212 had also been convicted of a drug possession offense, of resisting arrest, and of driving a motor vehicle while under the influence of intoxicating liquors. He also admitted to a prior arrest in New Jersey.

The state then exercised a peremptory challenge, and the juror was excused.

The defendant objected to the state's use of its peremptory challenge, alleging that such challenge was used in a racially discriminatory manner. The state responded that the juror's extensive criminal history constituted a race-neutral basis upon which it could properly exercise a peremptory challenge and that because of this history there was a risk that this juror may feel resentment toward law enforcement officers and harbor disrespect for authority. The trial justice found that defendant had made a prima facie showing of discrimination based on the fact that both defendant and the potential juror were black and on the fact that the state had previously exercised a peremptory challenge with respect to another black juror.[1] Nevertheless, the trial justice accepted the state's race-neutral rationale and overruled defendant's objection.

On appeal, defendant argues that allowing the state to remove juror No. 212 violated his constitutional rights to equal protection and the right to a jury representing a fair cross-section of the community. He asserts that if the state is allowed to exercise a peremptory challenge on the basis of prior contacts with law enforcement officials, a disproportionate number of minorities would be excluded from jury service. The state maintains that its use of the peremptory challenge was appropriate in that the numerous criminal convictions of the potential juror constitute a race-neutral explanation.

■ Under the *Batson* rule, when confronted with an objection to a challenge of a prospective juror made on the basis of race, the trial justice must first determine whether there is a prima facie showing that the challenge was motivated by race. Upon such a showing, the burden shifts to the prosecution to articulate its race-neutral reason(s) for challenging that particular juror. The trial court is then left to determine whether the defendant has carried his or her burden of proving purposeful racial discrimination. *See State v. Mollicone*, 654 A.2d 311, 324 (R.I. 1995); *State v. Holley*, 604 A.2d 772, 777

(R.I.1992). *See also Batson v. Kentucky*, 476 U.S. 79, 97–98, 106 S.Ct. 1712, 1723–24, 90 L.Ed.2d 69, 87–89 (1986). "The reasons given must establish a basis for challenge other than race. However, the challenge need not rise to the level necessary to sustain a challenge for cause." *Mollicone*, 654 A.2d at 324 (citing *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88); *see also Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). "[T]he decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge." *Holley*, 604 A.2d at 778 (quoting *Hernandez*, 500 U.S. at 365, 111 S.Ct. at 1869, 114 L.Ed.2d at 409). The trial justice's evaluation of the prosecutor's state of mind is accorded great deference. *Id.*

■ In the instant case the trial justice found that a prima facie showing of racial bias was established but that the race-neutral explanation offered by the prosecution was credible. Although defendant offered evidence of discrimination through his claim of disproportionate exclusion, he failed to prove that such disparity was motivated by racial animus. Accordingly we hold the trial justice did not err in overruling defendant's *Batson* objection.

## IV

### Selective Prosecution

The next point of error asserted by defendant concerns the trial justice's refusal to grant his motion to dismiss based upon selective prosecution. The defendant argues that he was singled out for prosecution because (1) the Attorney General was frustrated by defendant's impending release due to his status as a minor at the time he committed the murders for which he was incarcerated and (2) the fact that defendant had asserted his Fifth Amendment privilege against self-incrimination and refused to undergo a mental-

---

1. The defendant did not object to the state's use of a peremptory challenge with respect to the first black juror who was excused, thus it is not an issue for purposes of this appeal.

health examination ordered by a Family Court justice.

■ The case law in this area is uniform in recognizing the extreme deference due prosecutors in their prosecutorial decisions and the official discharge of their duties. *See, e.g., United States v. Armstrong*, 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996); *Wayte v. United States*, 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985); *United States v. Sepulveda*, 952 F.Supp. 94 (D.R.I.1997); *United States v. Roman*, 931 F.Supp. 960 (D.R.I.1996). There is a presumption of good faith in every prosecution that can only be rebutted with clear evidence to the contrary that demonstrates a discriminatory effect motivated by a discriminatory purpose. *See Armstrong*, 517 U.S. at 463–65, 116 S.Ct. at 1486, 134 L.Ed.2d at 698. This discretion, however, is not totally unfettered. Rather it is subject to constitutional constraints and cannot infringe upon the liberties guaranteed by the equal protection component of the due process clause. *Id.; see also Sepulveda*, 952 F.Supp. at 95; *State ex rel. Scott v. Berberian*, 109 R.I. 309, 315, 284 A.2d 590, 594 (1971). "A defendant may demonstrate that the administration of a criminal law is 'directed so exclusively against a particular class of persons * * * with a mind so unequal and oppressive' that the system of prosecution amounts to a 'practical denial' of equal protection of the law." *Armstrong*, 517 U.S. at 464–65, 116 S.Ct. at 1486, 134 L.Ed.2d at 698 (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 373, 6 S.Ct. 1064, 1073, 30 L.Ed. 220, 227 (1886)). This burden, while not impossible, is a heavy one to satisfy. *See Sepulveda*, 952 F.Supp. at 96.

■ In *State v. Ricci*, 704 A.2d 210 (R.I. 1997), this court recently stated that when called upon to review a claim of selective prosecution, we shall follow the rule of law announced by the United States Supreme Court in *Wayte*. "Following *Wayte*, a claim of selective prosecution can prevail only if the defendant can prove that the challenged enforcement has both a discriminatory effect and is 'deliberately based upon an unjustifiable standard such as race, religion, or some other arbitrary classification * * * including the exercise of protected statutory

and constitutional rights.' " *Ricci*, at 211 (quoting *Wayte*, 470 U.S. at 608, 105 S.Ct. at 1531, 84 L.Ed.2d at 556). Being singled out for prosecution alone, however, does not warrant a dismissal. The defendant must also demonstrate that the selection was intentional or purposeful. *See Berberian*, 109 R.I. at 315, 284 A.2d at 594.

■ In this case the trial justice properly conducted an evidentiary hearing during which several witnesses testified that to their knowledge no other Training School resident has ever been criminally prosecuted for threatening a staff member. There was also testimony that internal disciplinary procedures are uniformly employed when a resident is accused of threatening a staff member. Were we to accept this as true and hold that defendant has demonstrated that he was singled out from prosecution from others who are similarly situated, defendant has nevertheless failed to satisfy the second prong of the test that requires the discrimination be invidious. Indeed we hold on the facts of this case that defendant is unable to demonstrate invidious discrimination. This prosecution was not instituted because of any personal enmity on the part of the Attorney General but rather because a Family Court judge ordered the State Police to conduct an investigation into the conduct of defendant—an individual whose presence at the YCC and appearance before the Family Court were occasioned by his admitted commission of four murders—to determine if defendant's conduct was of a criminal nature. The State Police conducted their investigation and then submitted the information to the Attorney General's office. The Attorney General presented the case to a Grand Jury which in turn voted to issue an indictment. Relying upon these facts, we hold that defendant failed to satisfy the second prong of the test and therefore affirm the decision of the trial justice to deny defendant's motion to dismiss.

## V

### Right to Trial Publicity

The defendant's last argument alleges that the trial justice erred in denying his request for televised proceedings. The defendant,

together with a local cable company, argued that electronic media coverage was included in his right to a public trial under both the Rhode Island and the United States Constitutions. The defendant also argued that televised coverage of the trial would provide him with a "more balanced public presentation." The state expressed concern about whether television coverage of the trial would upset or unnerve the jury; ten of the fourteen jurors had objected to the idea when questioned by the trial justice. Nevertheless, the state indicated that it would defer to the trial justice's discretion on the matter. As was previously stated, the trial justice denied the request, stating that he feared the networks would manipulate the video by taking short segments out of context. Moreover, he feared that the presence of cameras and the attendant publicity would serve to prejudice defendant unduly as they would serve as a constant reminder to the jury that defendant had previously murdered four people.

On appeal, defendant acknowledges that the decision to allow television coverage is a decision that rests within the sound discretion of the individual trial justice. The defendant urges this court to revisit the issue, arguing that the "electronic age" of contemporary society requires that defendant's right to a public trial afforded by the Sixth Amendment to the United States Constitution and article I, section 10, of the Rhode Island Constitution include the televised coverage of his trial. The state responds by simply stating that the Sixth Amendment does not afford a defendant a right to televised coverage, citing *United States v. Hastings,* 695 F.2d 1278, 1284 (11th Cir.1983).

Article VII of the Supreme Court Rules, "Rules of Media Access," speaks directly to this issue:

> "*The trial justice may in his or her sole discretion prohibit the video recording, broadcasting and/or photographing of a participant with a film, videotape, or still camera* on the trial justice's own motion or on the request of a participant in a court proceeding. *The trial justice may entirely exclude media coverage of any proceeding or trial over which he or she presides in his or her sole discretion.* From any decision by a trial justice excluding the media in whole or in part, or limiting the photographing or recording of a participant in a court proceeding, there shall be no review by the Presiding Justice, Chief Judge of the trial justice's court, or by the Supreme Court." Id. at Canon 11. (Emphases added.)

Canon 11 expressly prohibits a review of the trial justice's decision to prohibit cameras in the courtrooms of this state. Because we decline to find any constitutional implications inherent in the exercise of a trial justice's discretionary decision to permit media coverage of that court's proceedings, we need go no further. *See Chandler v. Florida,* 449 U.S. 560, 569, 101 S.Ct. 802, 807, 66 L.Ed.2d 740, 748 (1981); *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 610, 98 S.Ct. 1306, 1318, 55 L.Ed.2d 570, 578 (1978); *In re Extension of Media Coverage For A Further Experimental Period,* 472 A.2d 1232, 1234 (R.I.1984).

## VI

### Conclusion

Accordingly the defendant's appeal is denied and dismissed. The judgments of conviction appealed from are affirmed, and the papers in this case may be remanded to the Superior Court.