STATE

v.

Craig C. PRICE.

Nos. 2001–64–C.A., 94–396–C.A.

Supreme Court of Rhode Island.

April 18, 2003.

See also, 672 A.2d 893.

Michael Stone, Joseph P. Youngs, III, Aaron L. Weisman, Providence, for Plaintiff.

Robert B. Mann, Providence, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, and GOLDBERG, JJ., and WEISBERGER, C.J. (Ret.).

# OPINION

WEISBERGER, Chief Justice (Ret.).

This case comes before us on appeal by Craig C. Price (defendant) from a judgment of the Family Court for the County of Providence that held the defendant guilty of criminal contempt. He appeals from an earlier judgment entered by the Chief Judge of the Family Court holding him to be in civil contempt. He also appeals from the sentence imposed on the criminal contempt charge of twenty-five years imprisonment, of which ten years were to be served and fifteen years were suspended. He challenges a later judgment of the Family Court, which determined that the defendant had violated the terms and conditions of the suspended portions of his criminal contempt sentence. We deny and dismiss the defendant's appeal and affirm the judgments of the Family Court that we reviewed. We decline to review the validity and propriety of the sentence at this time. The facts and procedural history of this case insofar as pertinent to the appeal are as follows.

## Facts and Procedural History

On September 21, 1989, defendant was fifteen years of age. He had been ac-cused of the brutal murder of Joan M. Heaton and her two small daughters in their home on the night of September 4, 1989. He also had been accused of the murder of Rebecca Spencer in her home on the night of July 27, 1987. On September 21, 1989, he appeared before a justice of the Family Court and admitted sufficient facts to be adjudicated delinquent on the four charges of murder, as well as two charges of burglary by virtue of entry into the Heaton and Spencer dwellings. Pursuant to the statutes then in effect, defendant was ordered to be committed to the Rhode Island Training School (Training School) and there to be held until his twenty-first birthday. This was the maximum penalty that the Family Court could impose. The Family Court justice intended to provide for intensive treatment of defendant during his period of commitment in order to diagnose and treat such psychiatric and/or personality disorders that may have contributed to his unprovoked, unusually brutal conduct,[1] and to make it possible for him to be released into the community when his approximately five-year commitment to the Training School ended. To accomplish this, the Family Court justice arranged, in cooperation with the authorities at the Training School, to obtain the services of two outstanding experts in the field of mental health. These experts were Shervert Frazier, M.D., who formerly had been the director of the National Institute of Mental Health and chief of psychiatry at McLean Hospital, and Wesley Profit, Ph.D., who was deputy director of the Bridgewater State Hospital in Massachu-

---

**1.** At his hearing on September 21, 1989, defendant admitted that he had committed all four murders and agreed with the findings of the medical examiner that the murders of Jennifer Heaton, Melissa Heaton, and Joan Heaton all had been done by multiple stab wounds and blunt-force trauma. He further admitted to the murder of Rebecca Spencer, which resulted from multiple stab wounds. In effect, defendant exhibited an unusual homicidal fury in the manner of killing his victims.

setts and was also director of forensic services at that institution. These experts were instructed to formulate a diagnostic and treatment plan for defendant. They were retained at state expense and were considered by the justice of the Family Court as the best resource persons to prepare defendant for eventual release into the community.

Arrangements were made with the public defender who represented defendant to present him for a psychiatric examination to begin the diagnostic process. Counsel for defendant had no objection at the outset, but at the second meeting, on November 16, 1989, when the doctors indicated their intention to discuss with defendant his recollection of the events surrounding the subject homicides, defendant said that he would be unable to discuss these matters as a result of having talked to his attorney. He also said that he would be unable to continue to participate in the psychiatric and psychological examinations. Further discussions with defendant and with the attorney disclosed that his withdrawal from the diagnostic and treatment process resulted from fear expressed by his attorney that this psychiatric examination might lead to a civil commitment under the Mental Health Law, G.L.1956 chapter 5 of title 406, that could result in his being placed into a psychiatric facility for commitment beyond his twenty-first birthday.

After these events, defendant was brought before the justice of the Family Court, who prescribed the course of treatment on several occasions. On each of these occasions, the justice ordered him to cooperate in the psychiatric evaluation and sought to persuade him that it would be in defendant's best interests to do so. He assured defendant that it was not his intention to use the psychiatric treatment program to detain defendant beyond his twenty-first birthday. As an additional step, the justice appointed a guardian ad litem to advise defendant concerning the advantages of psychiatric treatment. The justice also sought to obtain intercession of defendant's parents to this end. Although the Family Court justice spoke in terms of defendant's best interests in a manner consistent with the *parens patriae* function of the Family Court, in the course of defendant's appearances, he admonished defendant that he had no Fifth Amendment right to refuse psychiatric consultation and that he was ordering defendant to participate in the evaluation and treatment program. During a review of defendant's case on February 15, 1990, the justice was advised that treatment could not occur without a full assessment by the two experts of defendant's recollections of the crimes that he had committed and his mental reactions to the reasons why he was at the Training School. Counsel for the state emphatically requested that the court "make whatever order it feels appropriate to accomplish this and obtain his cooperation in the examination." At that point, an assistant public defender argued to the court that the state would try to use such information in a later proceeding to commit defendant past his twenty-first birthday. The colloquy clearly indicated that defense counsel was referring to a civil mental health commitment. Doctor Profit, at the hearing, expressed his opinion that it was essential for defendant to get on with the healing process. He further expressed the opinion that if defendant did not receive treatment and was released into the community, there would be a danger of repeating crimes similar to those to which he had admitted his guilt.

In response to a report of the doctor's opinion, the justice said that he did not know of any Fifth Amendment right that defendant had at this time. He added that if defendant should sit at the Training

School for five years and do nothing, then at the end of the five years, he would more likely be subject to civil commitment than if he cooperated now in his treatment. It was at this juncture that he appointed a guardian ad litem and sought the aid of defendant's parents.

Two months later, on April 18, 1990, representatives of the Division of Juvenile Correctional Services (DJCS) reported that defendant was still refusing to participate in the court-ordered evaluation. On April 26, 1990, the guardian ad litem presented his report. This report disclosed that after two meetings with defendant, the guardian ad litem was unable to persuade defendant to participate in the evaluation and treatment program. The reason was defendant's concern that information given to the therapists would be used by the state to seek an involuntary civil commitment to a mental health facility beyond his twenty-first birthday. The guardian ad litem concluded his report with the following:

"[I]n [defendant's] analysis and based upon remarks attributable to the prosecutor regarding civil commitment, inspite [sic] of my recommendation to him that he cooperate, Craig believes his cooperation and participation in this evaluative and treatment process is not in his best interest and, thus, he will decline to participate in such a process at this point in time."

After this report, the justice asserted unequivocally in the presence of defendant that he "would order him to cooperate" and further suggested that Dr. Profit's opinion was that his mental condition would deteriorate during his stay at the Training School without outside help or the help of his expert therapists.

On May 15, 1990, representatives of the DJCS again reported that defendant did not want to answer any questions by any-

one and had no interest in treatment at that time. On October 23, 1990, the Family Court justice again was informed by DJCS representatives that defendant would not participate in the evaluation process because of his concern relating to possible civil commitment. The report indicated that defendant had no interest in treatment and wanted simply to forget about his crimes, complete his stay at the Training School, and leave. However, Dr. Profit also filed a report at the request of the DJCS that set forth an extremely foreboding prognosis in the event that defendant should continue to refuse to participate in evaluation and treatment:

"First, there can be no doubt that Craig Price is a murderer of the serial type. At this point as you well know, Craig, on advice of counsel, is unwilling to discuss his state of mind at the time of the murders. I suspect from all that I have seen and know of these murders that Craig was in a psychotic rage at the time of these events and that he should probably be classified as a serial murderer, disorganized type. At this point and without great cooperation and assistance from Craig, it cannot be determined what are the psychodynamic underpinnings of Craig's behavior. Without an accurate formulation as to why these things occurred, it is virtually certain that Craig Price will not be able to demonstrate significant improvement or get well on his own. Without the assistance of a skilled therapist through the long and arduous process of examination of his thoughts and fantasies about what happened and his understanding of his reasoning or lack of same for engaging in this behavior, it is unlikely that Craig Price will be significantly different (and therefore at less risk of repeating this behavior) upon his

release than he was on the day of his commitment to your facility.

"Secondly, the mere passage of time is unlikely to produce a change for the better in Craig Price and there is no reason whatsoever to suspect that the passage of time alone can take the place of an aggressive treatment program for this individual.

"Thirdly, Craig Price's unwillingness to discuss the circumstances surrounding his behavior and his tendency to minimize and deny the importance of that behavior, including the view that these murders occurred in the service of efforts on his part to rob the adult victims, are but further examples of psychopathological symptomatology at work.

"Finally, it is my opinion that Craig Price suffers from a substantial disorder of thought, mood, orientation, perception, and memory which grossly impairs his judgment, behavior, capacity to recognize reality and ability to meet the ordinary demands of life. In short, it is my view that Craig Price suffers from a major mental illness for which treatment is required. While that treatment can now be rendered at your facility, there may come a time when Craig Price will require treatment in a more secure forensic psychiatric setting.

"I would suggest therefore that you continue to pursue with Craig Price the need for him to engage in meaningful treatment and that you continue to make available to him the opportunity to meet with a therapist to discuss these matters. You should not under any circumstance adopt or accept his view that he is not in need of treatment nor should you take his refusal to be anything other than a manifestation of the pathology underlying the behavior which caused him to be sentenced to your facility.

Craig Price, despite his outward appearances and despite his sometimes charming personality, is an individual who is in dire need, in my opinion, of the best and most intensive treatment that can be made available. Even with that, it may very well be that Craig Price will not be in a position where he can be safely placed in the community for a significant period of time into the foreseeable future and beyond."

Nevertheless, defendant continued to refuse to carry out the ordered evaluation and therapeutic process. Hearings on October 25, 1990, and on October 24, 1991, disclosed that defendant continued to refuse to participate in psychiatric evaluation. The same determination was reported at a hearing on October 22, 1992, whereupon the Family Court justice specifically asked defendant whether he was aware that there was a court order requiring that he undergo a psychological examination. The defendant responded to that question with an affirmative reply. During ensuing months, there was no change in defendant's attitude. The defendant still refused to accept any form of treatment. On October 20, 1993, after defendant had attained the age of twenty years, he was presented before a different Family Court justice. The hearing took place on October 21, 1993. Counsel for the state reported to this justice the long history of lack of cooperation and included in the statement that a third justice of the Family Court had also urged defendant to cooperate. In response to this report, the Family Court justice, after hearing, made the following comment:

"Mr. Price, you have been ordered to cooperate with counseling. It's in the past, been ordered on many occasions in the past, and you have refused to do so. I remind you that it remains an order of this Court that you do submit to those

evaluations and cooperate, and if you don't, this Court could find you in contempt upon proper motion to that effect, but that remains an ongoing order of this Court. The Court will make that an order. I will again reissue that order again at this time that Mr. Price submit to the evaluation in accordance with the previous orders of this Court."

In spite of this order, defendant continued his refusal to participate in the evaluation and therapeutic process until a representative of the Attorney General sought a hearing before the Chief Judge of the Family Court. This representative set forth that court orders had been issued requiring compliance with the therapeutic evaluation program on February 15, 1990, April 26, 1990, October 25, 1990, October 24, 1991, October 22, 1992, and October 19, 1993. The state urged the Chief Judge to hold defendant in contempt. The court asked for memoranda, and a hearing date was set for June 27, 1994, after the parties' memoranda had been filed. It was now less than four months from defendant's twenty-first birthday. An extensive hearing was conducted at which counsel for the state and counsel for defendant presented various arguments. The Chief Judge held that this proceeding was one for civil contempt and not criminal contempt. He found defendant in civil contempt of the court's order and ordered him to be held at the Adult Correctional Institutions (where he was serving a sentence imposed by the Superior Court) until such time as he would purge himself of contempt by cooperating with the evaluation process. The outer limit of the sentence was for a period of one year, but could be terminated at any time by defendant's compliance with the previous orders. The defendant did move, on July 1, 1994, that he be purged of contempt because he was now willing to comply with the order of the court to undergo a psychological or psychiatric evaluation. In late August and early September 1994, he met with Richard Barnum, M.D., who was retained by the court as a forensic psychiatrist. (The earlier-appointed experts were no longer available.) Doctor Barnum reported after these meetings that defendant had lied to him concerning the events of the homicide. Consequently, the Chief Judge determined that defendant had not cooperated with the examination, even though he participated. Therefore, the Chief Judge denied the motion to purge on June 8, 1995.

Thereafter, the state moved to hold defendant in criminal contempt. The Chief Judge of the District Court was assigned to the Family Court to preside over the criminal contempt proceedings. A jury was empanelled, and after a four-day trial, the jury which had been empanelled under the authority of the Family Court found defendant guilty of criminal contempt. Approximately two months after the rendition of the verdict, the trial judge imposed the sentence of twenty-five years imprisonment, of which ten years were to be served and the fifteen-year balance was suspended with a probationary period of the same duration.

In support of his appeal, defendant has raised eight issues and numerous sub-issues. These issues will be considered in the order of their significance to this opinion.

Further facts will be provided as may be necessary in order to deal with the issues raised by defendant.

## I

### The Privilege against Self-Incrimination

Central to defendant's contention that he should not have been adjudged in contempt is the argument that he refused to

participate and cooperate in psychiatric and psychological evaluations based upon his Fifth Amendment privilege against self-incrimination. Although defendant, through his counsel, adverted to the Fifth Amendment privilege against self-incrimination, he clearly stated that his refusal to participate in the diagnostic and treatment process was based upon his fear (and that of his counsel) that the psychological evaluation might result in his being civilly committed under the Mental Health Law. Both Dr. Profit and Dr. Frazier had informed the court that such treatment was absolutely essential prior to defendant's release into the community.

As earlier set forth in this opinion, the guardian ad litem unequivocally stated, in his report to the Family Court, that defendant feared that his participation in this evaluation and treatment process might result in civil commitment. At no point did defendant or his attorney set forth any cogent reason to fear *criminal* prosecution as a result of his discussions of his crimes with the psychiatric and psychological forensic experts.

It should be noted that the Family Court had exhausted its penal powers when it sentenced defendant to incarceration at the Training School until his twenty-first birthday. This was the maximum punishment that could be imposed on defendant as a juvenile. This incarceration was based upon his admission of sufficient facts to hold him delinquent for four charges of murder and two counts of burglary. If subsequent interrogation indicated that he had committed additional crimes, no further penalty could be imposed upon him by the Family Court. Thus, as a practical matter, he could not have incriminated himself further. His only apprehension was the possibility of civil commitment under the Mental Health

Law. Both he and his counsel were quite candid on this point.

The Supreme Court of the United States in *Allen v. Illinois*, 478 U.S. 364, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986), held that the privilege against self-incrimination did not apply to psychiatric interviews that might lead to civil commitment. Even though the Illinois commitment of a person as sexually dangerous was similar in many respects to penal incarceration, the Court, in an opinion by then-Justice Rehnquist, quoted with approval an observation by the Illinois Supreme Court that applying the privilege against self-incrimination to such psychiatric interviews and evaluations would completely thwart the therapeutic purpose that was central to the Illinois scheme of providing psychiatric care as needed for sexually dangerous individuals. *Id.* at 367, 106 S.Ct. at 2991, 92 L.Ed.2d at 303. The United States Supreme Court quoted *Addington v. Texas*, 441 U.S. 418, 426, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323, 331 (1979), for the proposition that

"The state has a legitimate interest under its *parens patriae* powers in providing care to its citizens who are unable because of emotional disorders to care for themselves; the state also has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill." *Allen*, 478 U.S. at 373, 106 S.Ct. at 2994, 92 L.Ed.2d at 307.

The Court went on to comment that the Illinois "decision to supplement its *parens patriae* concerns with measures to protect the welfare and safety of other citizens [did] not render the [a]ct punitive." *Id.* A *fortiori*, defendant's apprehension or that of his counsel that he might be subject to commitment under the Rhode Island Mental Health Law would not give rise to a reasonable claim or even a colorable claim of reliance upon the Fifth Amendment

privilege against self-incrimination. Moreover, in *Allen v. Illinois,* the Court also rejected a claim of privilege based upon the due process clause, specifically rejecting the petitioner's reliance on the principles enunciated in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). *Allen,* 478 U.S. at 374–75, 106 S.Ct. at 2994–95, 92 L.Ed.2d at 308.

The defendant in the case at bar was at no time in danger of any further criminal penalties for the crimes for which he had been incarcerated or for any other crimes that may have been committed attendant to those charges. His only concern was in respect to a possible civil commitment under the Mental Health Law. Such a mental health certification to a state hospital or psychiatric inpatient facility would be far less punitive in design than the Illinois sexually dangerous commitment considered by the Supreme Court in *Allen.* Consequently, the purported invocation of the privilege against self-incrimination was entirely without basis in either law or in fact.

The defendant also argues that pursuant to *State v. Paquette,* 117 R.I. 638, 369 A.2d 1096 (1977), it was essential that he be instructed about immunity. *Paquette* dealt with our statute which grants transactional immunity. It had no application to the case at bar, in which no immunity, either use or transactional, was either applicable or necessary. The tribunal had completely exhausted its penal power by incarcerating defendant until his twenty-first birthday. It was repeatedly pointed out by justices of the Family Court that defendant had no privilege against self-incrimination. If it could be argued that Justice DePetrillo was less than emphatic in admonishing defendant about the absence of a privilege and the danger of contempt if he did not cooperate with the psychiatrist, certainly Justice Suttell was

definite and unequivocal in his admonition in this respect. Ultimately, the Chief Judge of the Family Court held defendant in civil contempt for having defied numerous court orders over a period of about five years. The Chief Judge incarcerated defendant but allowed him to terminate his incarceration at any time by participating and cooperating with the psychiatric and evaluation treatment process. Nevertheless, in spite of this clear indication of the absence of a Fifth Amendment right against self-incrimination, defendant, during his last months of incarceration by the Family Court, did not cooperate with the examination. The forensic psychiatrist, Dr. Richard Barnum, reported that defendant had lied concerning the events of his four homicides in that his relation of the circumstances differed markedly from the agreed facts that he had admitted before the Family Court. In sum, defendant defied numerous Family Court orders over approximately five years of incarceration without a colorable claim of a privilege against self-incrimination. This was done solely for the purpose of avoiding a possible civil commitment to which the privilege was not applicable.

Consequently, defendant's reliance upon the privilege in refusing steadfastly to obey the numerous orders of the Family Court was misplaced. His reliance upon the advice of counsel was also misplaced for reasons which we shall outline below.

## II

### The Motion for Judgment of Acquittal

The trial judge denied defendant's motion for judgment of acquittal on numerous grounds. Among these grounds, the trial judge held that defendant was not justified in defying the orders of the Family Court on the basis of the Fifth Amendment privilege against self-incrimination for reasons that were set forth above. The trial judge

was clearly correct in denying the motion for judgment of acquittal on Fifth Amendment self-incrimination grounds. The defendant also argues that the Family Court, during the five-year period of defendant's incarceration, never clearly and unequivocally ordered defendant to participate and cooperate in the psychiatric evaluation and treatment process. The trial judge rejected this argument.

■ We set forth earlier that the order of Family Court Justice Suttell was direct, clear, and emphatic. Certainly the holding by the Chief Judge of the Family Court that defendant was in civil contempt for failing to obey the previous orders would eliminate any possible doubt about the clarity and mandatory quality of the court's order that defendant must comply with psychiatric examination and treatment. No warning or admonition could be more crystal clear than the findings and holding of the Chief Judge of the Family Court that defendant's refusal to comply was contemptuous. In adjudging defendant guilty of civil contempt, the Chief Judge of the Family Court still gave him the opportunity to purge himself of contempt by complying. The defendant refused to do so. Therefore, the trial judge in the criminal contempt procedure properly denied the motion for judgment of acquittal based on the argument that the Family Court had not given defendant notice of the necessity of his compliance to avoid contempt. Cases such as *United States v. Lanier*, 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) and *Bouie v. City of Columbia*, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964) are completely inapplicable.

The defendant also argues that he could not have been held in contempt as a matter of law since throughout his period of disobedience to the orders of the Family Court he had been explicitly relying on the advice of counsel. Many courts have rejected the defense of advice of counsel to a charge of criminal contempt. In *United States v. Remini*, 967 F.2d 754, 755 (2nd Cir.1992), the defendant had refused to testify at the trial of a case entitled *United States v. Thomas Gambino* held in the Federal District Court for the Eastern District of New York before Judge Weinstein. Remini raised a defense based upon his privilege against self-incrimination. *Id.* This defense was rejected on the ground that immunity had been afforded to him. *Id.* He was held in civil contempt and thereafter he was indicted for criminal contempt for failing to testify. *Id.* at 755–56. He then asserted the defense that he had acted on the advice of counsel. *Id.* at 756. The District Court rejected this defense and did not allow it to be presented in the course of the trial. *Id.* On appeal, the Second Circuit, speaking through Judge Feinberg, stated that it was the "established law of [that] [C]ircuit that 'advice of counsel is not a defense to the act of contempt, although it may be considered in mitigation of punishment.' *United States v. Goldfarb*, 167 F.2d 735, 735 (2d Cir.1948) (per curiam). *Accord United States v. Underwood*, 880 F.2d 612, 618–19 (1st Cir.1989)[.]" *Remini*, 967 F.2d at 757.

In *United States v. Armstrong*, 781 F.2d 700 (9th Cir.1986), the United States Court of Appeals for the Ninth Circuit also rejected a proposed defense that the conduct of the defendants was not willful because of the good-faith reliance upon the advice of counsel not to testify. The Court of Appeals considered this issue as one of law and therefore reviewed the rejection of the defense by the District Court *de novo. Id.* at 706. The Court commented as follows:

"Appellants misinterpret the nature of the 'good faith' defense to a charge of criminal contempt. Although a defendant's good faith belief that he is com-

plying with the order of the court may prevent a finding of willfulness, good faith reliance on the advice of counsel to disobey a court order will not. *See United States v. Snyder,* 428 F.2d 520, 522–23 (9th Cir.), *cert. denied,* 400 U.S. 903, 91 S.Ct. 139, 27 L.Ed.2d 139 (1970) * * *." *Armstrong,* 781 F.2d at 706.

The rationale for these rejections of advice of counsel as a defense has been set forth in Lawrence N. Gray's *Criminal and Civil Contempt: Some Sense of a Hodgepodge,* 72 St. John's L.Rev. 337 (1998):

"In establishing intent, it is sufficient to find that a refusal to obey was the product of rational choice. The fact that the rational choice is predicated on the advice of counsel is irrelevant. * * * "While cooperation with one's lawyer is important and should be encouraged, 'an attorney may not exculpate his client of contempt by advising him to disobey an order of the court because the judge is wrong.' The responsibility of complying or not complying with a court order rests solely with the person commanded. Viewed cynically, a defense to contempt based on advice of counsel is an invitation to every sophisticated scoundrel to seek an attorney who will give advice that he or she need not obey the order and thus be safe in the expectation that there will be immunity from the consequences of the disobedience." *Id.* at 370–71 (citing *United States v. Monteleone,* 804 F.2d 1004, 1011 (7th Cir.1986)).

Consequently, the trial judge was correct in refusing to grant a motion for judgment of acquittal based upon the argument that defendant had relied upon the advice of counsel.

We have considered defendant's other arguments in support of his claim that the trial judge erred in denying his motion for judgment of acquittal and find these arguments unpersuasive.

## III

## The *Batson* Claim Relating to the State's Use of a Peremptory Challenge

During the selection of the jury, counsel for the state exercised a peremptory challenge to an African–American juror. Counsel for the defense objected to this challenge based upon the principles enunciated in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The defense argued that this challenge was based upon racial discrimination. We recently defined the obligation of a trial justice when faced with a *Batson* issue:

" 'Under the *Batson* rule, when confronted with an objection to a challenge of a prospective juror made on the [issue] of race, the trial justice must first determine whether there is a prima facie showing that the challenge was motivated by race.' *State v. Price,* 706 A.2d 929, 935 (R.I.1998). 'Upon such a showing, the burden shifts to the prosecution to articulate its race-neutral reason(s) for challenging that particular juror.' *Id.* 'The trial [justice] is then left to determine whether the defendant has carried his or her burden of proving purposeful racial discrimination.' *Id.* '[T]he decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge.' *State v. Holley,* 604 A.2d 772, 778 (R.I.1992) (quoting *Hernandez v. New York,* 500 U.S. 352, 365, 111 S.Ct. 1859, 1869, 114 L.Ed.2d 395, 409 (1991)). '[T]he trial justice's evaluation of the prosecutor's state of mind is accorded great deference.' *Id.*" *State v. Lopez,*

721 A.2d 837, 838–39 (R.I.1998) (per curiam).

We earlier had stated in *State v. Holley*, 604 A.2d 772, 778 (R.I.1992) that a challenge of even a single juror may be sufficient to establish a prima facie showing of discrimination. The experienced trial judge in this case required the prosecution to articulate its race-neutral reasons for challenging that particular juror. The prosecution did so with the following comment:

"MR. YOUNG: Serving on juries is difficult, to say the least, and myself and Mr. Stone struck Mr. Madyun. We talked about it. It was a juror we would have strucken irregardless of his race, and it certainly was not because of his race in any event. I was also struck by the question that Mr. Mann posed at the end, which I objected to and was sustained, and that bothered me because a seed was planted in this young man's mind that they might be susceptible to retribution. Certainly that wasn't what Mr. Mann had in mind with that question which was objected to and sustained.[2]

"I was struck by his answer that he listens to his boss. I, frankly, don't think his age and his abilities would make him a good juror. That's from the State's point of view for us to strike. It was not categorically because of his race."

After the prosecutor's explanation, the burden was upon defendant to establish that the challenge was based upon the race of the juror and not for race-neutral reasons. A colloquy occurred between counsel for the state and counsel for the defense in which defendant's counsel argued that there was no real reason to challenge this potential juror because of his age or his possible fear that his findings as a juror might cause him to be looked upon with disapproval by his neighbors and friends. The trial judge considered the comments of both counsel and noted our comments in *Lopez, supra,* which had been derived from *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

In accordance with his obligation, the trial judge considered all the factors, including the fact that there were two other African Americans on the jury, and determined that the explanation of the prosecutor and his race-neutral basis for challenge was credible. As we said in *Lopez*, 721 A.2d at 838–39, " '[t]here will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge.' * * * '[T]he trial justice's evaluation of the prosecutor's state of mind is accorded great deference" ' and is reviewed for clear error.

It should be borne in mind that a peremptory challenge need not rise to the level of a challenge for cause. Consequently, the reasons set forth by the attorney who made the challenge always are subject to disagreement about their weight and persuasiveness. However, under the deferential standard of review established by our own Court in conformity to the mandate of the Supreme Court of the United States, we cannot say that the trial justice was clearly wrong in accepting the explanation of counsel for the state and finding that defendant had failed to prove that the challenge was racially motivated.

Consequently, defendant's argument on this issue does not prevail.

---

**2.** In the course of the voir dire, it had been disclosed that Mr. Madyun had a relative and a friend who had been sentenced to the Adult Correctional Institutions. Defense counsel had asked Mr. Madyun whether, if he voted for acquittal, he had considered that the state "might look unkindly upon your friends and relatives."

## IV

### The Claim of Double Jeopardy

■■■ The defendant argued to the trial justice that the adjudication of civil contempt by the Chief Judge of the Family Court on June 27, 1994, constituted a criminal penalty and therefore precluded his being tried for the charge of criminal contempt pursuant to a later complaint brought by the state. This requires a determination concerning whether the adjudication of civil contempt by the Chief Judge of the Family Court was in fact a criminal rather than a civil determination. There is no question that the line is often blurred between civil and criminal contempt. Generally, an important distinction between civil and criminal contempt is that the purpose of criminal contempt is punitive and designed to vindicate the dignity of the court, while civil contempt is not punitive but coercive and designed to bring about compliance with an order of the court. It is very clear from the terms of the adjudication in civil contempt by the Chief Judge of the Family Court that he was attempting to use the contempt power to coerce the defendant into participating in and cooperating with the psychological and evaluation treatment program. Although he imposed a sentence of one year, he left the key to the jail in defendant's pocket by allowing him to purge himself of this civil contempt at any time by participating and cooperating in the psychiatric review process. Consequently, the adjudication by the Chief Judge of the Family Court was a classic example of civil contempt. Not only was it designated by the Chief Judge of the Family Court as civil contempt, but it conformed with all the attributes of civil contempt as opposed to criminal contempt. *See International Union, United Mine Workers of America v. Bagwell,* 512 U.S. 821, 827–28, 114 S.Ct. 2552, 2557, 129 L.Ed.2d 642, 651–52 (1994) (characterizing civil contempt as "coercive and avoidable through obedience" and giving paradigmatic examples); *see also Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 441–42, 31 S.Ct. 492, 498, 55 L.Ed. 797, 806 (1911), and 4 Charles E. Torcia, *Wharton's Criminal Law,* § 604 at 338–42 (1996).

■■■ The ban on double jeopardy as set forth in the Fifth Amendment to the Constitution of the United States does not preclude imposing a criminal penalty after a civil penalty has been imposed. The Supreme Court of the United States has held that imposing a civil sanction does not preclude imposing a criminal penalty for the same act. In *United States v. Ursery,* 518 U.S. 267, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996), the Court held that imposing property forfeiture sanctions did not constitute a bar to criminal proceedings. The forfeiture proceedings were held to be remedial and not punitive. The Court reversed holdings by both the Ninth and Sixth Circuit Courts of Appeal that held to the contrary. The Court commented that "[i]t is well settled that 'Congress may impose both a criminal and a civil sanction in respect to the same act or omission.' " *Id.* at 292, 116 S.Ct. at 2149, 135 L.Ed.2d at 571. *See also United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984); *One Lot Emerald Cut Stones and One Ring v. United States,* 409 U.S. 232, 93 S.Ct. 489, 34 L.Ed.2d 438 (1972) (per curiam).

The trial justice did not err in rejecting the motion to dismiss on the ground of double jeopardy.

## V

### The Motion to Dismiss on the Grounds of Statute of Limitations, Speedy Trial, and Laches

■■■ The defendant argues that his pretrial motion to dismiss based on the delay

in charging him with criminal contempt should have been granted. He pointed out that the felony complaint was filed on August 4, 1994, charging defendant with criminal contempt on various dates between November 16, 1989, and July 6, 1994. He argued that the first order of the Family Court requiring participation in psychiatric evaluation and treatment was issued September 21, 1989, more than three years before the criminal complaint was filed.

However, defendant overlooks the fact that the Family Court issued numerous orders subsequent to the September 21, 1989 order. It has been held that "[t]he statute of limitations for an offense begins to run when the crime is complete[d]." *United States v. Rouleau*, 894 F.2d 13, 14 (1st Cir.1990). The Family Court ordered defendant to participate in the psychiatric evaluations on October 22, 1992, and October 19, 1993. Thereafter, the state moved before the Chief Judge to hold defendant in civil contempt. The Chief Judge entered an order finding defendant in civil contempt with the option of purging himself at any time by complying with the previous orders. This proceeding took place on June 27, 1994, with the finding that defendant was in civil contempt for violating numerous orders of the Family Court that he participate in psychiatric evaluation and treatment. As recently as June 8, 1995, the Chief Judge denied defendant's motion to purge himself of civil contempt on the ground that he lied to Dr. Barnum about the events surrounding the four homicides in that he contradicted the statements made when he was admitting facts sufficient to hold him as a delinquent.

Thus, defendant's course of contumacious conduct had continued up to a point when he had been held in civil contempt and beyond. The fact that the Family Court had exercised great restraint and patience over a long period of time did not affect the validity of its recent orders requiring defendant's cooperation right up to the time that he was held in civil contempt. There was no violation of the statute of limitations of G.L.1956 § 12–12–17.

■ The argument in respect to laches is unpersuasive. The state had been urging that defendant be held in contempt each time defendant was brought before the court on the numerous occasions when he declined to comply with the court's order. Certainly, the state made every effort to proceed against defendant, and the proceeding before the Chief Judge on civil contempt resulted only from one of the state's last efforts to bring the court's contempt power to bear. The state had moved to adjudge defendant in contempt as early as December 4, 1989. Neither the state nor the Family Court did anything to lull defendant into a sense of security that he would not be subjected to the court's contempt power or held accountable for noncompliance with the orders of the court. *See Adam v. Adam*, 624 A.2d 1093, 1096 (R.I.1993); *O'Reilly v. Town of Glocester*, 621 A.2d 697, 702 (R.I.1993).

There is no indication that defendant was denied due process because he had ample notice over the period of five years that the Family Court insisted on his compliance. The finding of civil contempt brought the Family Court's determination to the attention of defendant in the most dramatic manner conceivable.

The trial judge did not err in denying the motion to dismiss on the grounds of statute of limitations, delay, and denial of due process.

## VI

### Defendant's Challenge to the Finding of Civil Contempt

The defendant has argued *pro forma* that the court erred in finding him guilty

of civil contempt. He incorporates by reference the arguments in support of his motion for judgment of acquittal on the criminal contempt charge. He suggests that this issue is largely moot except for its impact on the other components of this appeal.

For the reasons given to support our sustaining the trial judge's denial of the motion for judgment of acquittal on the criminal contempt charge, we also reject defendant's contention that he was entitled to a judgment of acquittal on the civil contempt charge.

## VII

### The Challenge to Jury Instructions

 The defendant argues that the trial judge erred in the instructions given to the jury in declining not to give a Fifth Amendment instruction, and declining to instruct the jury that defendant could rely on advice of counsel. We respectfully disagree with defendant's contentions on these grounds because they raised issues of law and not of fact. As we have noted above in the opinion, there was no Fifth Amendment privilege against self-incrimination applicable to this case. Similarly, we noted that defendant had no right to disobey an order of the court merely because his attorney advised him to do so. Therefore, these issues could not have justified a jury finding that defendant was absolved of his obligation to obey the court orders. It is the function of the court to decide issues of law. The jurors are the judges of the facts. *See Chapin v. Stone,* 77 A. 826 (R.I.1910) (per curiam). Issues of law should not be presented to the jury for its decision. *See Kuzniar v. Keach,* 709 A.2d 1050, 1055 n. 6 (R.I.1998).

 The defendant also suggests that the trial judge erred in declining to instruct that he had a right to rely on the actions of the Family Court if they indicated to him that he need not comply with the orders of the court. The trial judge did instruct the jury that a "defendant has a right to rely on the actions of the state." He further admonished the jury that the Family Court was an arm of the state. He went on to tell the jury that if it found that defendant had relied on the Family Court, it could take this evidence into consideration in determining defendant's guilt or innocence. We are of the opinion that this instruction was sufficient to submit this issue of fact for consideration to the jury.

The defendant also challenges the instruction relating to vagueness, the instructions on the meaning of contempt, and the instruction on reexamining their views.

 As required, we have examined the court's instructions in their entirety. *State v. Perry,* 770 A.2d 882, 886 (R.I.2001) and *State v. Tooher,* 542 A.2d 1084, 1088 (R.I.1988). In considering the instructions of the court in their entirety, we are of the opinion that they covered the factual issues to be submitted. The court defined the nature of contempt and set forth every element necessary to a finding of contempt beyond a reasonable doubt. *See United States v. Gaudin,* 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) (holding that the Fifth and Sixth Amendments require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged). Counsel for defendant has challenged phrases and portions of sentences in the course of this lengthy charge to the jury. We are of the opinion that these challenges are without merit. We have often stated that a trial justice may give instructions in his or her own words as long as those instructions adequately meet the requirements of the law. The trial justice need not accept the suggested

language of a defendant as long as his or her charge gives an adequate expression to the required definitions and propositions of law applicable to the case. *Tooher,* 542 A.2d at 1088. As an illustration of this principle, the challenge to the instruction on the reexamining of views by jurors is instructive. The court instructed the jury as follows:

"Approach the questions with common sense and with honesty. Address yourselves to the issues forthrightly and courageously. You should neither be stubborn nor should you bend to the whims or desires of any other person. In other words, if you have an abiding conviction one way or the other, you should not sway from that conviction until you have been reasonably persuaded or convinced that you were wrong."

In objecting to this instruction, counsel for defendant seems to confuse this instruction with an instruction on reasonable doubt. This was clearly not the focus of this instruction. We are of the opinion that no juror would have construed this instruction on considering the opinion of his or her fellow jurors as diminishing in any way the burden of proof on which the trial judge gave a full instruction which has not been challenged by defendant.

Having considered all defendant's challenges to the trial judge's charge, we conclude that they are without merit and disclose no prejudicial error.

## VIII

### Violation Proceeding

The defendant argues that he moved to dismiss the violation proceeding on the ground that defendant could not be found to be a violator of a sentence he was not yet serving. When defendant was sentenced for criminal contempt, he was already serving another sentence for extor-

tion. The criminal contempt sentence was made consecutive to the extortion sentence. We have held in *State v. Dantzler,* 690 A.2d 338, 340 (R.I.1997), that when a defendant "has been sentenced to a term that includes any period of probation" and is thereafter found "to have committed any act that constitutes a violation of the implied condition of good behavior," he may be punished for any violation of that implied condition from the moment the sentence has been imposed until the expiration of the total term of the sentence. The implied condition of good behavior is immediately effective upon the imposition of the sentence. *Id.* It does not accrue only upon expiration of a previous sentence to which the subject sentence is consecutive.

In *Dantzler,* 690 A.2d at 339, the defendant had pleaded nolo contendere to a robbery charge and received a twenty-five year sentence with eighteen years to serve, seven years suspended, and seven years of probation. The sentencing judge informed the defendant that his probationary period would "commence upon his release." *Id.* After the sentence was imposed, but before his release, the defendant escaped from custody and committed a sexual assault while at large. *Id.* He was presented as a violator of the probation previously imposed on his earlier robbery charges. He argued that he could not be violated on the earlier-imposed probation because he had not yet completed serving the sentence of incarceration and therefore his period of probation had not begun. *Id.* After citing numerous cases from other jurisdictions, we held that the defendant may be punished for any act that constitutes a violation of the obligation of good behavior that comes into existence at the very moment the sentence is imposed. *Id.* at 340–42. Consequently, defendant in the case at bar was properly subjected to punishment for a criminal act that occurred after the sen-

tence was imposed even though that sentence was made consecutive to another period of imprisonment that defendant was already serving. The defendant does not challenge the grounds for his revocation of probation but only the timeliness of its imposition.

The trial judge did not err in declining to dismiss the violation proceeding.

## IX

### Excessive Sentence

The defendant argues that the sentence imposed upon his conviction for criminal contempt was excessive. He recognizes that this Court has generally declined to review either the validity, legality, or excessiveness of a sentence on direct appeal. *State v. Collins*, 679 A.2d 862, 867 (R.I. 1996); *State v. Mollicone*, 654 A.2d 311, 324–25 (R.I.1995); *State v. Brigham*, 638 A.2d 1043, 1046–47 (R.I.1994). We have repeatedly held that the proper procedure for reviewing a sentence imposed in the Superior Court would be by a motion to reduce this sentence pursuant to Rule 35 of the Superior Court Rules of Criminal Procedure. *State v. McVeigh*, 660 A.2d 269, 276 (R.I.1995).

The defendant, however, refers us to language in our opinion in *State v. Price*, 672 A.2d 893, 898 (R.I.1996), in which we declared that we would review a sentence in respect to the punishment of contempt for abuse of discretion. There is no question that this would be our standard of review when the issue was properly presented to us. The defendant also cites our review of sentences of life imprisonment without parole as in *State v. Travis*, 568 A.2d 316 (R.I.1990). This review of life sentences without parole on direct appeal is required of us by statute. G.L.1956 § 12–19.2–5. However, in all other contexts, we have steadfastly maintained the requirement that a defendant first seek relief from the Superior Court before we would consider reviewing the sentence for validity or excessiveness.

■ We recognize that this sentence was not imposed by the Superior Court, but by a judge of the Family Court appointed on special assignment. However, Rule 37 of the Family Court Rules of Juvenile Proceedings adopts the Rules of Criminal Procedure of the Superior Court in the conduct of criminal cases involving adults charged with crimes within the jurisdiction of the Family Court. Therefore, we are of the opinion that Rule 35 would be applicable to this case. Pursuant to this rule, defendant may file a motion to reduce sentence with the Family Court. If defendant is aggrieved after a justice of the Family Court has issued a judgment based on that motion, this Court will review that judgment on appeal. At that time, the standard of review set forth in *Price*, 672 A.2d at 898, will apply.

Consequently, we decline to review the sentence imposed by the Family Court for excessiveness, without prejudice to defendant's pursuing his remedy in the Family Court pursuant to Rule 35 of the Superior Court Rules of Criminal Procedure, which has been adopted by the Family Court for cases of this nature.

## X

### Other Issues

We have considered all other issues raised by the defendant and conclude that they are without merit.

### Conclusion

For the reasons stated, the appeal of the defendant is denied and dismissed, and the judgments of the Family Court that we reviewed are hereby affirmed. The papers in the case may be remanded to the

Family Court for such further proceedings as the defendant may choose to initiate consistent with this opinion.