Craig C. PRICE

v.

Ashbel T. WALL.

No. 2007–209–Appeal.

Supreme Court of Rhode Island.

Dec. 2, 2011.

Susan B. Iannitelli, Esq, for Applicant.

Aaron L. Weisman, Department of Attorney General, for State.

Present: GOLDBERG, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice GOLDBERG, for the Court.

This case came before the Supreme Court on November 2, 2011, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. The applicant, Craig C. Price (Price or applicant) was convicted, after a jury trial, of one count of criminal contempt and

sentenced by the Family Court[1] to twenty-five years at the Adult Correctional Institutions (ACI), ten years to serve and the remaining fifteen years suspended, with probation.[2] Price appealed the judgment to this Court, and in April 2003, this Court affirmed his conviction in *State v. Price*, 820 A.2d 956 (R.I.2003).

Price next filed an application for postconviction relief in the Family Court on August 23, 2004, and a hearing was held on September 22, 2004. The application was denied in its entirety on February 14, 2005. Price is before the Court *pro se* on appeal from the denial of his application for postconviction relief.[3] Having carefully reviewed the memoranda submitted by the parties and the arguments of counsel, we are satisfied that cause has not been shown; thus, the appeal may be decided at this time. We affirm the judgment of the Family Court.

## Facts and Travel

On September 21, 1989, when he was just fifteen years old, Craig Price admitted committing four brutal murders, by multiple stab wounds and blunt-force trauma. It was undisputed that he "exhibited an unusual homicidal fury in the manner of killing his victims," including two young girls.[4] *Price*, 820 A.2d at 959 n. 1. The brutality of these offenses shocked the community. Because he was a juvenile, Price was committed to the custody of the Rhode Island Training School (Training School) until his twenty-first birthday.[5]

1. The Chief Judge of the District Court was sitting by designation as the trial justice in the Family Court. He also presided over the case currently before the Court.

2. In 1998, Price was found to have violated the terms of his probation in this case. The trial justice consequently revoked seven years of applicant's suspended sentence, which resulted in an increase to seventeen years to serve, with the remaining eight suspended.

3. The Court extends its appreciation to Price's standby counsel for her efforts in this case.

4. "At his hearing on September 21, 1989, [Price] admitted that he had committed all four murders and agreed with the findings of the medical examiner that the murders of Jennifer Heaton, Melissa Heaton, and Joan Heaton all had been done by multiple stab wounds and blunt-force trauma. He further admitted to the murder of Rebecca Spencer, which resulted from multiple stab wounds. In effect, [Price] exhibited an unusual homicidal fury in the manner of killing his victims." *State v. Price*, 820 A.2d 956, 959 n.1 (R.I.2003).

5. Since these horrific events in 1989, this Court has been confronted with numerous cases involving Craig Price. In 1994, we held that the Family Court had broad power to initiate contempt proceedings against any individual, juvenile or adult, who acted in defiance of a lawful order of that court. *See generally In re Price*, 645 A.2d 488 (R.I.1994). In 1996, we held that Rhode Island courts possess inherent power to impose, in their reasonable discretion, such penalties for contempt as they deem appropriate—and consequently that the Family Court could sentence Price for criminal contempt to the extent deemed appropriate in the trial justice's discretion. *See generally State v. Price*, 672 A.2d 893 (R.I.1996). In *Bouchard v. Price*, we heard an appeal concerning a wrongful death action brought against Price by the state General Treasurer and the family members of Price's victims. *See generally Bouchard v. Price*, 694 A.2d 670 (R.I.1997). In 1998, Price appealed his convictions for simple assault and extortion, which he committed while confined at the Training School, and we affirmed the convictions. *See generally State v. Price*, 706 A.2d 929 (R.I.1998). In 2003, Price was before the Court on appeal from the contempt conviction, which we affirmed in its entirety. *See generally State v. Price*, 820 A.2d 956 (R.I.2003).

We are now passing on Price's collateral attack on his contempt conviction. This Court is mindful that it has been over two decades since the Family Court first declared Price delinquent based on his commission of four murders. He has been imprisoned since 1989—over twenty-two years.

Based on the vicious nature of the killings and the fact that these crimes were unprovoked, the Family Court justice directed the Training School to provide intensive psychiatric treatment for Price with the goal of rehabilitation and return to the community. However, Price consistently refused to participate in treatment; his excuse was that he feared that by disclosing information relating to the murders, he could subject himself to civil commitment proceedings pursuant to the Mental Health Law. The applicant maintained that his privilege against self-incrimination, under both the Fifth Amendment to the United States Constitution and article 1, section 13 of the Rhode Island Constitution, prohibited the Family Court from compelling his participation in the treatment program.

Undaunted, the Family Court persisted in its efforts toward Price's rehabilitation; on February 15, 1990, April 26, 1990, October 25, 1990, October 24, 1991, October 22, 1992, and October 19, 1993, the court issued orders requiring applicant's compliance with the treatment program. Price persisted in his refusal to cooperate. On June 27, 1994, the Chief Judge of the Family Court determined that applicant, who was twenty years of age, was in civil contempt of the orders of the Family Court. Price was ordered to be held at the ACI until such time as he would submit to the treatment program and, in so doing, purge himself of contempt; but in no event was he to be held longer than one year.[6] In yet another act of defiance of the Family Court, applicant met with a psychiatrist in August and September 1994, and, according to the psychiatrist, Price lied to him about his role in the murders.[7] The Family Court justice consequently denied Price's motion to purge himself of civil contempt, and the state filed a complaint in the Family Court, charging Price with criminal contempt in accordance with G.L.1956 § 8–6–1.

After a four-day jury trial, applicant was found guilty of criminal contempt. The trial justice sentenced Price to twenty-five years imprisonment, with ten years to serve and the balance suspended, with probation.[8] Price appealed the conviction directly to this Court, and we affirmed. *See Price*, 820 A.2d at 973.

The applicant next applied for postconviction relief, alleging that: (1) his conviction was in violation of the Double Jeopardy Clause; (2) his conviction was the result of ineffective assistance of counsel; (3) the sentence imposed amounted to cruel and unusual punishment by means of an excessive sentence; and (4) he was denied due process because he was declared a violator and ordered to serve a portion of the suspended sentence, which had not yet begun.[9] A hearing was held in the Family Court on September 22, 2004, and on February 16, 2005, the trial justice issued a decision denying Price's application in its entirety. Shortly thereafter, applicant filed a timely notice of appeal to this

6. At this point, applicant was serving a sentence at the ACI for an unrelated felony crime. *See Price*, 706 A.2d at 930–32.

7. The forensic psychiatrist reported that Price's account of the four homicides differed markedly from the agreed facts that he had admitted before the Family Court.

8. As noted, Price was found to have violated the terms and conditions of his probation, and was ordered to serve an additional seven years. Price never challenged the grounds for revocation of his probation, only whether it lawfully was imposed. *Price*, 820 A.2d at 973.

9. At the postconviction hearing, applicant also contended that the trial justice lacked jurisdiction to preside over the criminal contempt trial, but he does not raise that claim in this appeal.

Court, alleging the same constitutional violations.

## Standard of Review

■ General Laws 1956 § 10–9.1–1, the postconviction remedy, provides an avenue for one convicted of a crime to seek collateral review of that conviction based on alleged violations of his or her constitutional rights. "In passing on a decision granting or denying postconviction relief, we will not disturb the factual findings of the [trial] justice absent clear error or a showing that the [trial] justice overlooked or misconceived material evidence or was otherwise clearly wrong." *Pierce v. Wall,* 941 A.2d 189, 192 (R.I.2008) (citing *Gonder v. State,* 935 A.2d 82, 85 (R.I.2007)). This Court will, however, review a ruling concerning a defendant's constitutional rights *de novo. Rodrigues v. State,* 985 A.2d 311, 313 (R.I.2009) (citing *Hassett v. State,* 899 A.2d 430, 433 (R.I.2006)).

## Analysis

■ The applicant first avers that the constitutional prohibition on double jeopardy was violated when he was convicted of criminal contempt for refusing to cooperate in psychiatric treatment, after having already been adjudicated to be in civil contempt for the same offense. In *Price,* 820 A.2d at 969, an opinion authored by former Chief Justice Weisberger, this Court held that Price's two contempt adjudications did not violate double jeopardy principles because the Fifth Amendment to the United States Constitution "does not preclude imposing a criminal penalty after a civil penalty has been imposed * * * for the same act." Based on our conclusion in *Price,* 820 A.2d at 969, that applicant's double jeopardy argument lacked merit, *res judicata* bars us from again revisiting Price's claim of error.[10] *See Thornley v. Mullen,* 115 R.I. 505, 507–08, 349 A.2d 158, 159 (1975) (stating that *res judicata* bars the applicant from relitigating in postconviction relief an issue that the Court already had determined on direct appeal). "The doctrine of res judicata relates to the preclusive effect of a final judgment in an action between the parties. * * * 'This doctrine ensures that judicial resources are not wasted on multiple and possibly inconsistent resolutions of the same lawsuit.'" *Plunkett v. State,* 869 A.2d 1185, 1187 (R.I.2005) (quoting *ElGabri v. Lekas,* 681 A.2d 271, 275 (R.I.1996)). "Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 467 n. 6, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982).

■ In this case, Price seeks to distinguish his double jeopardy argument from the claim he previously litigated; he contends that his confinement for civil contempt actually was an adjudication of criminal contempt because, he argues, after the Family Court denied Price's motion to purge, the one year limitation placed by the Family Court on the civil contempt hold became punitive in nature.[11] However, "[a] petitioner for post-conviction relief

**10.** In G.L.1956 § 10–9.1–8 the Rhode Island General Assembly codified the principle of *res judicata* in this context:

"Any ground finally adjudicated or not so raised * * * in the proceeding that resulted in the conviction or sentence or in any other proceeding the applicant has taken to secure relief, may not be the basis for a subsequent application, unless the court

finds that in the interest of justice the applicant should be permitted to assert such a ground for relief."

**11.** The record discloses that Price's motion to purge himself from civil contempt was denied nineteen days before the expiration of the one year limitation imposed by the Family Court.

cannot escape the effect of claim preclusion merely by using different language to phrase an issue and define an alleged error." *Overstreet v. State*, 877 N.E.2d 144, 150 n. 2 (Ind.2007). Because Price could have raised this variation of his double jeopardy argument on direct appeal but did not do so, *res judicata* bars him from doing so now. *See Mattatall v. State*, 947 A.2d 896, 904–05 (R.I.2008) ("[A] judgment on the merits in the first case not only is conclusive with regard to the issues that were actually determined but also precludes reconsideration of *all other issues that might have been raised in the prior proceeding*." (quoting *Carillo v. Moran*, 463 A.2d 178, 182 (R.I.1983))); *Taylor v. Wall*, 821 A.2d 685, 688 (R.I.2003) ("*Res judicata* bars the relitigation of any issue that could have been litigated in a prior proceeding, including a direct appeal * * *.").

■ Furthermore, were we to consider this latest incarnation of applicant's double jeopardy argument, we are satisfied that his contentions lack merit. This Court's decision in *Price*, 820 A.2d at 969 specifically held that the Family Court Chief Judge who adjudicated Price to be in civil contempt, "was attempting to use the contempt power [of the Family Court] to coerce the [applicant] into participating in and cooperating with the psychological and evaluation treatment program," thus affording Price the opportunity to purge himself of contempt simply by yielding to treatment. We conclude that the motivation behind the Family Court's order was a hallmark of civil contempt, which is designed to coerce the contemnor and bring about compliance with the court's directive. *See id.* The fact that the Family Court subsequently denied applicant's mo-

tion to purge himself of contempt is of no moment to the issue before this Court because Price had yet to comply with the court's orders by fully and truthfully cooperating with treatment professionals, nor did he seek to do so at any point thereafter. For all these reasons, we reject Price's double jeopardy argument.

■ The applicant's second contention follows from his first: he alleges that his appellate counsel rendered ineffective assistance by failing to raise the precise double jeopardy argument that he now raises on appeal. In order to demonstrate ineffective assistance of counsel under the rubric set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), an applicant must "show (1) 'that counsel's performance was deficient, to the point that the errors were so serious that trial counsel did not function at the level guaranteed by the Sixth Amendment,' and (2) 'that such deficient performance was so prejudicial to the defense and the errors were so serious as to amount to a deprivation of the applicant's right to a fair trial.'" *Young v. State*, 877 A.2d 625, 629 (R.I.2005) (quoting *Bustamante v. Wall*, 866 A.2d 516, 522 (R.I.2005)). When alleging ineffective assistance by appellate counsel, "to meet both *Strickland* prongs, an applicant must demonstrate that the omitted issue was not only meritorious, but 'clearly stronger' than those issues that actually were raised on appeal." *Chalk v. State*, 949 A.2d 395, 399 (R.I.2008) (quoting *Smith v. Robbins*, 528 U.S. 259, 288, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000)). Because we have determined that applicant's double jeopardy claim has no merit, it follows that applicant's counsel was not ineffective by failing to raise it.[12] We con-

12. We note that the Family Court trial justice, speaking about Price's attorney, remarked that: "I would have to assume that he's

among the best lawyers to practice before the court," and that Price agreed that his lawyer

clude that applicant's claim of ineffective assistance of counsel must fail.

■ The applicant next avers that the sentence of twenty-five years, ten years to serve and fifteen years suspended for criminal contempt, was excessive and violated the Eighth Amendment to the United States Constitution. In *Price*, 820 A.2d at 973, we observed that "this Court has generally declined to review either the validity, legality, or excessiveness of a sentence on direct appeal." The Court concluded that the proper course for challenging the sentence was to file a motion to reduce sentence in accordance with Rule 35. *See Price*, 820 A.2d at 973 ("we have steadfastly maintained the requirement that a defendant first seek relief from the Superior Court before we would consider reviewing the sentence for validity or excessiveness"); *see also State v. McVeigh*, 660 A.2d 269, 276 (R.I.1995) (stating this Court's firm position that a Rule 35 motion is the proper vehicle for challenging an improperly or illegally imposed sentence). The record before us discloses that Price did not pursue a sentence reduction under Rule 35 because he feared that by doing so, he would open the door for the state correspondingly to move for an increase in his sentence. The applicant contends that this Court should entertain his appeal notwithstanding his failure to proceed in accordance with Rule 35. Based on the unique circumstances of this case, we shall do so.

■ Accordingly, we shall proceed to address the merits of applicant's contention that his sentence was excessive, in violation of the Eighth Amendment. "[A]

constitutional violation will be found only in extreme circumstances in which the sentence is grossly disproportionate to the offenses for which defendant stands convicted." *State v. Monteiro*, 924 A.2d 784, 795 (R.I.2007); *see McKinney v. State*, 843 A.2d 463, 467 (R.I.2004) ("a punishment is 'excessive' and unconstitutional if it (1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime" (quoting *Coker v. Georgia*, 433 U.S. 584, 592, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977))). In conducting this review, however, we are mindful that "[t]his Court has maintained 'a strong policy against interfering with a trial justice's discretion in sentencing matters' * * *." *State v. Snell*, 11 A.3d 97, 101 (R.I.2011) (quoting *State v. Ruffner*, 5 A.3d 864, 867 (R.I.2010)).

The record demonstrates that applicant repeatedly and defiantly refused to obey a series of court orders directing him to comply with the therapeutic evaluation program that was painstakingly crafted by the Family Court with the salutary goal being rehabilitation.[13] Given the "unprovoked, unusually brutal conduct" exhibited by this fifteen-year-old in the commission of four horrific murders, the therapeutic program and rehabilitation was considered to be of the highest priority. *See Price*, 820 A.2d at 959–60. The applicant's persistent refusal to cooperate in his own rehabilitation presented a grave danger to the public, and it constituted a criminal offense against the authority and dignity of the Family Court. One of the important

---

"did an excellent job for me." We echo those comments.

**13.** We determined in *Price*, 820 A.2d at 965, that applicant had no Fifth Amendment right to defy the court's treatment orders because

he "was at no time in danger of any further criminal penalties for the crimes for which he had been incarcerated or for any other crimes that may have been committed attendant to those charges."

measures of a court's effectiveness in the administration of justice is the confidence the public has in its decisions, coupled with the court's ability to enforce its orders and vindicate its authority. *See generally State v. Price*, 672 A.2d 893 (R.I.1996). Throughout his years of confinement at the Training School and into adulthood, Price exhibited a menacing defiance of the Family Court's efforts, such that the sentencing justice was well within his discretion to impose punishment.

In rejecting Price's contention that the sentence was excessive, the trial justice detailed the multiplicity of factors contributing toward the appropriateness of the sentence, including the fact that an esteemed mental health professional had determined that "there can be no doubt that Craig Price is a murderer of the serial type." *Price*, 820 A.2d at 961.[14] Price's decision to refuse treatment irrevocably limited the potential for successful rehabilitation, as found by the trial justice. Citing a diagnostic report from a mental health professional, the trial justice noted that Price's decision to delay cooperating with psychiatric treatment until he was just shy of his twenty-first birthday—a milestone that Price considered to be his ticket to freedom—jeopardized public safety and deprived the Family Court of any real opportunity to provide Price with effective treatment. The tragedy of Price's refusal to undergo therapy poignantly was expressed by one professional who concluded that, "[w]ithout the assistance of a skilled therapist through the long and arduous process of examination of his thoughts and fantasies * * * it is unlikely that Craig Price will be significantly different (and therefore at less risk of repeating

this behavior) upon his release than he was on the day of his commitment * * *." *Price*, 820 A.2d at 961–62. The fact that when Price finally met with a psychiatrist, he proceeded to lie about his role in the murders was yet another act of defiance that warranted criminal punishment. For all these reasons, we are of the opinion that the trial justice acted well within his broad discretion in imposing this sentence; and, in light of the circumstances of this case, the sentence cannot properly be said to be excessive.

■ The applicant's final assertion of error concerns a finding that Price violated the terms of his probation, resulting in an additional seven years to serve. Price argues that because he was serving time for an unrelated charge at the time of the violation, he could not have violated a sentence that he was not yet serving. "Although it appears that G.L.1956 § 12–19–8 vests a sentencing justice with the authority to fix when the period of a defendant's probation is to commence, * * * that statute must be read in conjunction with § 12–19–9, which permits revocation of a defendant's probation whenever the terms and conditions inherent in the very privilege of probation are violated by the defendant." *State v. Dantzler*, 690 A.2d 338, 339 (R.I. 1997). Accordingly, in *Price*, 820 A.2d at 972, we held that applicant properly was held accountable for failing to be of good behavior. Our case law is clear that the sentencing justice "may revoke a suspended sentence or probationary term on the basis of criminal acts committed after imposition of a sentence but before the actual suspended or probationary portion of the

---

14. We are struck by the fact that at oral argument, applicant's counsel reported to the Supreme Court that Price was now ready and willing to participate in rehabilitative treatment. Over twenty years have passed since the order for treatment issued. Price's belated agreement to now commence rehabilitation is of no consequence to the issues before us on appeal.

sentence commences." *Dantzler,* 690 A.2d at 339.

Price attempts to distinguish his case from *Dantzler* by arguing that the stringent supervisory conditions that the sentencing justice placed on any probationary term connected with the contempt conviction signified that the sentence did not commence until his release. The applicant's argument is misplaced. The implied condition of good behavior attaches when a suspended sentence is pronounced; whether the sentencing justice exercised his prerogative by outlining stringent conditions for probation is irrelevant. *See Price,* 820 A.2d at 972. We also note that this issue was considered and rejected in *Price,* 820 A.2d at 972–73; for that reason, the principle of *res judicata* bars further consideration of the issue on appeal. Accordingly, we reject the applicant's fourth and final assertion of error.

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Family Court denying postconviction relief. The papers in the case may be remanded to the Family Court.

Chief Justice SUTTELL and Justice FLAHERTY did not participate.